[Crim. No. 5632. In Bank. Oct. 7, 1954.]

In re CARYL CHESSMAN on Habeas Corpus.

*Assigned by Chairman of Judicial Council.

Berwyn A. Rice, Jerome A. Duffy and J. W. Ehrlich for Petitioner.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Respondent.

SCHAUER, J.—The People move this court to vacate an order signed by Mr. Justice Carter on July 28, 1954, and filed on July 29, 1954, that execution of Caryl Chessman, fixed for July 30, 1954, be stayed "pending disposition of his petition for Writ of Certiorari by the Supreme Court of the United States [to review this court's minute order of July 21, 1954, denying Chessman's petition for habeas corpus and for stay of execution]."

The grounds of the People's motion to vacate the stay are: (1) That the order was beyond the jurisdiction of Justice Carter. (2) That the order was made on an erroneous assumption of facts. (3) That the order was obtained by false representations to Justice Carter. (4) That the application for stay was made solely for the purpose of delay. (5) That the application for habeas corpus filed with the court July 16, 1954, and denied July 21, 1954, and the subsequent application for stay were and are without merit.

Although, for the reasons hereinafter stated, we have concluded we should deny the People's motion we are of the opinion that in ruling upon that motion the circumstances of the case make it imperative that we indicate the matters of record upon which the court acted in denying Chessman's petition for habeas corpus and for stay of execution, and, as well, the state of the record at the time the stay order was granted.

We therefore assume, for the purposes of disposition of this matter, without so deciding, that Justice Carter, by virtue of title 28, U.S.C., § 2101, paragraph (f), was empowered to grant a stay of execution upon a proper showing of facts. Having made such assumption we detail the matters of record hereinafter set forth which indisputably establish that the claim upon which the application was based had already long since been presented and finally adjudicated.

The identity and character of the claim of Chessman (hereinafter sometimes called defendant) and the factual grounds relied upon by Justice Carter in making the stay order in response to it are established by the opinion filed by Justice Carter in this court on July 29, 1954, as follows:

"An application has been presented to me for a stay of execution pending the determination of a petition for a writ of certiorari to the Supreme Court of the United States to review the denial of an application to the Supreme Court of California for a writ of habeas corpus on July 21st, 1954. Said application is based upon the claim that the transcript on appeal from Chessman's conviction in the Superior Court of Los Angeles County was inaccurate due to the inability to correctly transcribe the notes of the official court reporter who died before approximately 1,200 pages of his reporter's notes were transcribed, and that the inaccuracy of this transcription was known to the prosecuting officials at the time the transcript was approved by the trial court and presented to the Supreme Court of California.

"It appears from said application that [1] the alleged fraudulent procurement of said transcript was not known to petitioner until June of this year and [2] the facts in connection therewith were never presented to any court until the petition for a writ of habeas corpus was filed in the Supreme Court of California on July 16th, 1954.

"In my opinion the application presents a serious constitutional question under the due process clauses of both the Constitutions of the United States and California . . .

"I have therefore granted Chessman a stay of execution pending the determination by the Supreme Court of the United States of the merits of his petition for a writ of certiorari."

The facts, all matters of record, are as follows:

On November 1, 1948, Chessman filed with this court his petition for prohibition (Crim. 4590) in which he alleged that Mr. Ernest R. Perry, the reporter who made a shorthand report of the trial, died before he had transcribed his notes; that on June 25, 1948, Chessman moved for a new trial on the ground of Perry's death, the motion was denied, and the judgments of conviction were pronounced; that Chessman is informed and believes that the trial judge, Judge Charles W. Fricke, requested other reporters to transcribe Perry's notes, and "that said reporters, whose identity is to this petitioner unknown, have found the fact to be, and have so advised . . . [the] Superior Court, that there are serious doubts that any reporter can transcribe said notes. . . . [That Judge Fricke] is now engaged in the process of attempting to prepare a record on appeal from the following

sources: (a) the fragmentary portions of the notes of said Ernest R. Perry which are capable of being transcribed; (b) notes taken by said Hon. Charles W. Fricke . . .; and (c) notes taken by Deputy District Attorney J. Miller Leavy during the progress of the trial''; that ''the acts and threatened acts of said court . . . in connection with the attempt of said Superior Court to complete a record on appeal were, are and will be illegal and void for the reason that said Court is without jurisdiction to act in said matter.'' On November 22, 1948, this court by minute order denied the petition for prohibition.

As stated in *People* v. *Chessman* (1950), 35 Cal.2d 455, 458 [218 P.2d 769, 19 A.L.R.2d 1084], prior to his death Mr. Perry had made dictaphone records of part of his notes; a portion of these records had been transcribed before his death; transcription of the remainder was completed by the transcriber who had been employed by Mr. Perry; pursuant to court order Mr. Stanley Fraser, another official court reporter, read and transcribed the balance of Perry's notes; he was aided by voluminous notes of the trial judge and by conferences with Mr. Leavy. A copy of the resulting transcript was sent to defendant (who at that time represented himself) in San Quentin.

Allegations materially similar to the allegations of the July 16, 1954, petition for habeas corpus as to the manner in which the reporter's transcript was prepared after the death of Mr. Perry and charges that the transcript was inaccurate and fraudulent, have been repeatedly presented to this court and to other courts, and as often rejected, as related hereinafter in some detail.

On May 12, 1949, Chessman filed with the Superior Court of Los Angeles County, in support of his motion to correct and augment the record, his affidavit charging that Mr. J. Miller Leavy, the deputy district attorney who tried the case against Chessman and who aided Mr. Stanley Fraser in the preparation of the reporter's transcript, ''deliberately conspired in the production of a record that is spurious and has further deliberately misrepresented this is a verbatim record when he knows it is not, and that his misrepresentations were calculated to hoodwink the Supreme Court.'' The trial judge heard Chessman's objections to the transcript, allowed some and disallowed others; the judge rejected the quoted charges of conspiracy and misrepresentation.

On March 17, 1950, while motions of Chessman attacking the

transcript were pending in this court, Judge Goodman of the United States District Court for the Northern District of California denied Chessman's application for habeas corpus containing similar charges; thereafter, he denied Chessman's petition for a certificate of probable cause; and the United States Court of Appeals, Ninth Circuit, denied his petition for leave to appeal.

On May 19, 1950, this court, in denying motions of Chessman attacking the transcript, discussed his charges at length in *People* v. *Chessman, supra,* 35 Cal.2d 455, 463-465, as follows:

"The asserted 'inaccuracies and omissions in the record' of which defendant complains are as follows: (a) The greater part of defendant's complaints consists of general claims that large portions of the transcript of testimony of witnesses are incomplete or inaccurate. Defendant does not claim that any different and more accurate transcription of the notes would show that the trial court erroneously admitted or excluded any evidence. Certainly no factual basis is shown, and none is even claimed, for concluding that any erroneously admitted or excluded evidence prejudicially affected the verdicts. Claimed inaccuracies concern conflicting testimony and the credibility of witnesses. Making available to this court the precise words of every witness would not enable it to upset the jury's determination that the People's witnesses, rather than defendant and his witnesses, spoke the truth. . . . (b) Defendant asserts that the record is mistaken in showing that he did not cross-examine certain witnesses. The trial judge's determination to the contrary is supported not only by his own notes and the testimony of Mr. Fraser, the transcribing reporter, but also by the testimony of Mr. Al Matthews, deputy public defender, who acted as 'legal adviser' (not counsel) for defendant during the trial. (c) Defendant has specified some particular changes in the record which, he says, the trial judge should have allowed. The unimportance of these matters is apparent for, had the proposed changes been allowed, the effect of the record and the result of an appeal would have been in no way affected. (d) Defendant asserts that sarcastic statements of the prosecuting attorney during the trial have been omitted or 'smoothed over.' There is no claim that defendant objected to these statements or requested the court to admonish the prosecuting attorney and instruct the jury to disregard improper re-

marks, nor is there any claim that the remarks were so serious that their effect could not have been removed by admonishment. In only one instance was a change made in Mr. Fraser's transcription of statements of the prosecuting attorney. This change was *in the portion of the notes dictated by Mr. Perry* but not typed by his transcriber until after his death. It was requested by the prosecuting attorney. In allowing it the trial judge said, 'this is one of the matters that I do particularly recall because of the unusual character of the situation.' Even had the correction not been allowed, defendant could not on appeal maintain that the statement amounted to prejudicial misconduct, for it was clearly invited by defendant. (e) Finally, defendant claims that in the transcription of the prosecuting attorney's closing argument 'Objectionable, prejudicial matter has been weeded out. . . . Abusive references to the defendant have vanished.' Defendant specifies only two instances of such asserted inaccuracies. He says, 'Statements that "five to life means nothing to Chessman—life means nothing to Chessman" are abandoned in the transcription.' Defendant appears to be mistaken; a number of such statements appear in the transcript. And, defendant says, the transcript omits or modifies 'gross misstatements as to the law, incurable by instruction, to the effect that life without possibility of parole doesn't mean that at all, and that the jury should and must return the death penalty because otherwise there was imminent danger the defendant again would be loosed by a lax administration of the law to prey upon society because the defendant was a cunning individual who knew the angles.' Defendant appears to be mistaken in this claim also. The transcript contains a great deal of argument in accord with the quoted statements, and the language of the transcript is no more temperate than that quoted.''

This court concluded (p. 462 of 35 Cal.2d) that ''Examination of the record in the light of defendant's claims discloses that it is adequate to permit us to ascertain whether there has been a fair trial and whether there has been any miscarriage of justice.'' This court denied a petition for rehearing.

On June 12, 1950, this court by minute order (Crim. 5110) denied a petition of Chessman for habeas corpus which charged that the transcript was ''spurious, prejudicially incomplete and inaccurate'' and that ''by forcing the petitioner to use a record on appeal that is as incomplete and in-

accurate as is the one before the Court, petitioner is denied federal Constitutional due process and the equal protection of the laws.'' The United States Supreme Court denied certiorari (340 U.S. 840 [71 S.Ct. 29, 95 L.Ed. 616]).

On appeal from the judgments of conviction (*People* v. *Chessman* (1951), 38 Cal.2d 166, 172 [238 P.2d 1001]), Chessman again argued questions as to the correctness and validity of the transcript which had been finally decided against him in *People* v. *Chessman* (1950), *supra,* 35 Cal.2d 455. We held, ''Reexamination of these arguments and of the transcript leaves us convinced that the transcript permits a fair consideration and disposition of the appeal.'' This court denied a rehearing. The United States Supreme Court denied certiorari (343 U.S. 915 [72 S.Ct. 650, 96 L.Ed. 1330]) and a petition for rehearing (343 U.S. 937 [72 S.Ct. 773, 96 L.Ed. 1344]).

In *Chessman* v. *People* (1953, C.A. 9), 205 F.2d 128, 129, 131, the United States Court of Appeals rejected Chessman's contention ''that due to extrinsic fraud practiced by the prosecuting attorney and the trial judge the transcript of record forwarded upon appeal to the state supreme court was incomplete''; it held that because appellate review of a state judgment of conviction is not an element of due process, a state may accord the right of appeal upon such terms as it deems proper; ''And that there can be no denial of due process in the procedure used to settle the record on appeal, see *Dowdell* v. *United States* [1911], 221 U.S. 325, 328-329, 31 S.Ct. 590, 55 L.Ed. 753.'' Rehearing was denied. The United States Supreme Court denied certiorari (346 U.S. 916 [74 S.Ct. 278, 98 L.Ed. 412]) and a petition for rehearing (347 U.S. 905 [74 S.Ct. 430, 98 L.Ed. 1066]).

The foregoing presents a summary of Chessman's attacks upon the transcript (which have been formally brought to our attention) prior to his filing with this court, on July 16, 1954, of his petition for habeas corpus in which he again claimed want of due process by reason of asserted fraud of Mr. Leavy, prosecuting attorney, in inducing the trial judge to certify an incomplete and inaccurate transcript. The crimes which form the basis of the charges against Chessman were committed between January 3 and January 23, 1948. Informations charging him with seventeen offenses were filed on February 18, 1948. Seventeen judgments of conviction,

two of them imposing the death penalty,[1] were pronounced on June 25, 1948. Since then the proceedings hereinabove described have ensued.

The representation or assumption accepted and relied upon by Justice Carter "that the alleged fraudulent procurement of said transcript was not known to petitioner until June of this year" is contradicted not only by many allegations in the many proceedings above referred to but also by the very petition for habeas corpus, denial of which Chessman was seeking to challenge when he asked Justice Carter for the stay. That petition avers "That the facts herein alleged were known to Petitioner who was present at the trial of said action in the Superior Court, but that proof of the same were [sic] not substantiated by Petitioner until June 25, 1954, or thereabouts."

The July 16, 1954, petition for habeas corpus alleges that Mr. Stanley Fraser, who prepared the transcript, is "a close relative" of Mr. Leavy. It is not true that this fact (insofar as it is a fact) was not known to Chessman until June, 1954. In July, 1949, Emily Matthews, wife of Al Matthews, deputy public defender who served as Chessman's legal adviser during his trial, wrote to Chessman that "The record is in sad shape, they have the third man on it now, and Al is quite elated as he is M. L. wife's cousin." Chessman in 1949 filed this letter in the office of the county clerk of the county of Los Angeles.

The July 16, 1954, petition for habeas corpus alleges that Mr. Fraser "was a discredited Court Reporter from the State of Washington" and "was and is addicted to the excessive use of alcohol." These particular allegations were presented to this court for the first time in that petition. Such allegations add nothing of substance to the charge, repeatedly made,

---

[1]The circumstances of the crimes which resulted in imposition of the two sentences of death (for kidnaping for the purpose of robbery, with infliction of bodily harm, Pen. Code, § 209), as described in *People* v. *Chessman* (1951), *supra*, 38 Cal.2d 166, 185-186, were as follows: "On January 19, 1948, defendant stopped a car driven by him near a parked car occupied by Lea and Regina. He displayed a .45 automatic pistol and during the ensuing events repeatedly threatened to kill his victims if they did not obey his commands. Defendant took Lea's wallet, the keys to Lea's car, and Regina's purse. He then forced Regina to walk 22 feet to the car he was using, to enter the car, and to violate section 288a. . . . On January 22, 1948, defendant approached a parked car occupied by Hurlburt and Mary, pushed a .45 automatic pistol through the door, and said, 'This is a stick-up.' Both victims replied that they had no money. Defendant then forced Mary to enter his car, drove to an isolated place, and compelled her to submit to sex crimes."

that Mr. Fraser was unable to adequately transcribe Mr. Perry's notes.

The assertions as to Mr. Fraser's relationship to Mr. Leavy and his alcoholism are not ultimate facts or factual grounds for relief, but evidentiary facts. [redacted] With reference to the July 16, 1954, application for habeas corpus it can be said, as was said in the case of *In re De La Roi* (1946), 28 Cal.2d 264, 275 [169 P.2d 363], "There is nothing . . . to exclude this case from application of the established rule that a petition for habeas corpus based upon the same grounds set forth in a previous petition which was denied will be denied where there has been no change in the facts or law substantially affecting the legal rights of the petitioner. (*In re Miller* (1941), 17 Cal.2d 734, 735 [112 P.2d 10].) (The only claimed change in the showing now presented to the court, as distinguished from that presented on the prior application, is in the evidence, not in the facts [factual grounds] or in the law.)"

[redacted] The charge that the transcript was inaccurate and false was made as early as May, 1949, in Chessman's affidavit filed with the county clerk of the county of Los Angeles and presented to the superior court in support of Chessman's motion to correct and augment the record. It was elaborated upon before this court in Chessman's motion, filed with us on June 30, 1949. In that motion he stated, among other things, that the "reporter's transcript as filed is (a) prejudicially inaccurate and incomplete; (b) is non-usable because Mr. Perry's notes cannot be read and transcribed with reasonable or sufficient accuracy; because (c) Mr. Fraser had misrepresented his ability to read these notes; because (d) the deputy district attorney has made some blatant misrepresentations to the Supreme Court and has knowingly been a party to the production of a spurious transcript; because (e) it can only be logically concluded the trial court acted in bad faith in ignoring appellant's motion to prove this was a spurious record and failing to produce the appellant in court after (the evidence shows) the court had voiced its intention of doing so and allowing an attache of the Court to take oath to the Supreme Court this was the court's contention; and because (f) the court unfairly and inaccurately 'settled' the record, and then simply 'certified and ordered that the Reporter's Transcript on Appeal has been corrected.'"

In the affidavit attached to his motion (filed in this court June 30, 1949) Chessman avers "That affiant has in his pos-

session documents, affidavits, letters from what he considers reliable sources, copies of letters, original writings of the affiant read into the record, and other miscellaneous written and printed matter—as well as information communicated to the affiant verbally—which with certainty tends to show conclusively that the reporter's transcript as filed is substantially incomplete and inaccurate, that it was completed by highly improper means, and that the 'settlement' of this record did not fairly correct and augment the record.''

Chessman did not specifically identify or state any of the substance of the ''documents, affidavits,'' etc., which are so sweepingly referred to. He did, however, state further in his motion (filed with us on June 30, 1949) ''That the appellant [Chessman] can demonstrate Stanley Fraser has misrepresented his ability to read these [the deceased shorthand reporter's] notes. . . . That it is apparent that Mr. Leavy, the deputy district attorney who prosecuted the appellant . . . undertook to locate a reporter to transcribe these notes, was determined in advance to see that a record was produced, however; and that he has made false sworn representations as to the authenticity of this record to this Court and knowingly concealed facts and distorted statements for the record. . . . That the deputy district attorney has been guilty of irregularities in aiding in the preparation of the transcript. (That the appellant is purposely withholding the final proof of this until he is able to examine Mr. Leavy under oath, following which the appellant will explode for all time the myth that 'Mr. Leavy has done his very utmost towards preparing a correct record on appeal in this case.') . . . That the trial court did not act in good faith. . . . [I]t is a record where knowledge and proof of its invalidity has been suppressed. . . . It is a record produced by incompetent means unknown to the law and invented by the trial court. The appellant has compelling proof it is a spurious record.''

That Chessman's attack on the record on the grounds that it was ''spurious'' and ''fraudulent'' was not substantiated was first determined by the superior court in 1949. Such attack, with elaborations as related above, was continued in this court later in 1949 and by our formal decision filed May 19, 1950 (*People* v. *Chessman, supra,* 35 Cal.2d 455), we held that the record was validly authenticated and adequate to present all contentions made by Chessman. Further attacks on the record were presented to us and again resolved against Chessman by denial of habeas corpus on June 12, 1950 (Crim.

5110), and again by formal decision of this court in *People* v. *Chessman* (1951), *supra*, 38 Cal.2d 166, and the two latter judgments of this court were affirmed as against certiorari by the Supreme Court of the United States, all as hereinabove detailed.

Attached to the July 16, 1954, petition for habeas corpus is the affidavit of Berwyn A. Rice, one of Chessman's present counsel, which was made July 15, 1954, and which contains the following averments, which precise averments (but not the nature of the significant contention) were then presented to this court for the first time: That about June 25, 1954, Mr. Rice, accompanied by another person, called upon Mrs. Jean M. Tompkins, one of the trial jurors in the case against Chessman; that Mrs. Tompkins told Mr. Rice that on May 21, 1948, after the jury had retired to deliberate, they returned to court for further instructions and "the Trial Court strongly indicated that if the jury found Defendant guilty of the kidnapping charges, a verdict of death should be returned. That affiant presented a copy of the Transcript . . . to said juror, directing said juror's attention particularly to Pages 1788 to and including 1793, which said pages report [sic] to reflect the remarks of the Court in giving additional instructions on May 21, 1948; that said juror examined said portion of the transcript . . . and stated that the same did not contain all of the instructions and remarks of the Court given to the jury at that time; that said transcript represented only a small portion of the Trial Judge's remarks made at that time; that said transcript does not contain the true and correct statements of the Trial Court concerning the fixing of the death penalty in the event of a finding of guilty."

Attached to the People's notice of motion to vacate the stay is the affidavit of Mrs. Tompkins, which was made August 5, 1954, and which contains the following averments contradicting the above quoted averments of Mr. Rice: "that at no time did I read or examine any portion of the transcript which Mr. Rice had with him in June, 1954; that at no time did I tell Mr. Rice that the transcript did not contain all of the instructions or remarks of the Court to the jury; that at no time did I tell Mr. Rice that the said transcript represented only a small portion of the trial judge's remarks as made to the jury; that at no time did I tell Mr. Rice that said transcript did not contain the true and correct statements of the trial Court concerning the fixing of the penalty in the event

of a finding of guilty . . . ; that at no time did I tell Mr. Rice that the trial Court strongly indicated that if the jury found defendant Chessman guilty of the kidnaping charges a verdict of death should be returned.''

After the filing of the above affidavit of Mrs. Tompkins, Mr. Rice presented the affidavit of E. Benson, which avers that she was the person who accompanied Mr. Rice when he talked with Mrs. Tompkins on June 25, 1954; that affiant was instructed to listen carefully on this occasion; that Mrs. Tompkins stated that when the jury returned into court for further instructions as to penalty, ''in effect the Judge told them substantially, 'If you find the Defendant guilty of the kidnapping charges and do not fix the punishment at death, there is always the possibility that the Defendant will be released from prison at a future date'; that from what the Judge said in addition to this statement, she understood that if Chessman was found guilty, then the death penalty was mandatory . . . [Mrs. Tompkins looked over pages 1788 through 1793 of the reporter's transcript] and said that the Judge had said a lot more than appeared in the transcript.''

Resolution of any conflicts among the averments in the several affidavits above mentioned is unnecessary because it appears from the records of this court that arguments and contentions of Chessman in respect to the jury instructions and their reflection in the transcript were not presented to this court for the first time on July 16, 1954, but had previously been presented, considered at length, and ruled on. In our opinion in *People* v. *Chessman, supra,* filed December 18, 1951, reported in 38 Cal.2d 166, we said at pages 189-190, ''The prosecuting attorney argued that 'punishment for life imprisonment without possibility of parole does not mean what it says. Those are the words that are used in the statute defining the punishment, but that is not what it means,' because of the possibility of pardon, commutation or the Legislature's changing the penalty. Furthermore, he repeatedly commented that defendant 'hasn't much to lose if you just convict him of robbery. Robbery doesn't mean a thing to him. No. To convict him of robbery is just like you going home. Time means nothing to him.'

''The jury were apparently impressed by this argument, for after they had deliberated for a time they returned into court and requested instruction as to the meaning of life imprisonment without possibility of parole. The trial court said, 'that primarily means that the person committed to

prison under such a sentence will be required to serve life imprisonment in prison, and can not be paroled,' and explained that a person sentenced to life imprisonment for murder, for example, could be paroled. It went on to say further, however, as the prosecuting attorney had in his argument, that there was always a possibility of commutation, pardon, or a legislative change in punishment.[2] A juror asked whether, if the punishment of life imprisonment without possibility of parole were imposed, 'would there be any assurance that that party would never be free again?' and the court again pointed out the possibility of action by the governor or the Legislature.

"This insistence of the trial court in emphasizing such possibilities operated to his prejudice, defendant says, and resulted in the imposition of the death penalty. He relies upon such cases as *People* v. *Ramos* (1935), 3 Cal.2d 269, 272 [44 P.2d 301], and *People* v. *LeTourneau* (1949), 34 Cal.2d 478, 494 [211 P.2d 865], in support of his contention that the trial court should not have discussed the matter with the jury and should not have permitted the prosecuting attorney to argue it.

"The statements of which defendant complains relate solely to the question of punishment for the crime of kidnaping for the purpose of robbery where the victim suffers bodily harm, a question which is addressed to the discretion of the jury. (Pen. Code, § 209.) It is clear from the colloquy between the jurors and the judge, and from the verdicts subsequently arrived at, that it was this question which they were considering when they returned to court for further instructions. They must already have tentatively determined that the kidnaping victims had correctly identified defendant and drawn the permissible inferences that the kidnapings were within section 209 before they reached the question of the meaning of imprisonment without possibility of parole. Thereafter they exercised their discretion with discrimination, for they determined that the type of bodily harm inflicted upon defendant's female victims [the victims of two kidnapings for which the death penalty was imposed were forced to submit to sexual crimes] deserved a more severe punishment than the type of bodily harm inflicted on Waisler, victim of the ordinary kidnaping-robbery which constituted crime (16). 'It is understandable that jurors, who are charged

---

[2] As stated at page 191 of 38 Cal.2d, the Legislature after the date of trial of Chessman made such a change in punishment.

with the duty of fixing the penalty in the event that they find a defendant guilty . . . , should be interested in knowing the nature and effect of the penalties which they may impose; and neither reason nor authority indicates that the trial court should be prohibited from enlightening the jurors when questions are asked upon that subject.' (*People* v. *Osborn* (1951), 37 Cal.2d 380, 384 [231 P.2d 850].) Upon the circumstances shown here, there was no error in this respect.''

The specific assertion that the reporter's transcript omitted an instruction of the trial judge which, it is said, ''strongly indicated that if the jury found Defendant guilty of the kidnapping charges, a verdict of death should be returned'' was first made in the July 16, 1954, application for habeas corpus. But it is not and cannot be claimed that this matter (if true) was not known to Chessman when he first contended before the superior court in 1949 that the transcript was false, spurious, and inadequate, and at all times since when he has reiterated this contention. Chessman was present at all times during the trial, alertly attending the proceedings and vigorously representing himself with the aid of his legal adviser, Attorney Al Matthews. This particular assertion as to the inadequacy or inaccuracy of the transcript is but a further item in the long-continued and reiterated attacks on the transcript which have been presented to, and resolved against defendant by, not only the superior court and this court but also by the United States District Court, the United States Court of Appeals, and the Supreme Court of the United States. If this assertion was to be urged it should have been presented to the superior court in 1949 and to this court upon the motion in respect to the transcript which was adjudicated in *People* v. *Chessman* (1950), *supra,* 35 Cal.2d 455.

Finally it is to be noted that Justice Carter's opinion specifically points out that ''Said application [for a stay] is based upon the claim that the transcript on appeal from Chessman's conviction in the Superior Court of Los Angeles County was inaccurate due to the inability to correctly transcribe the notes of the Official Court Reporter who died before approximately 1200 pages of his reporter's notes were transcribed, and that the inaccuracy of this transcription was known to the prosecuting officials at the time the transcript was approved by the trial court and presented to the Supreme Court of California.'' As has already been shown herein, precisely the same claim was presented to this court and resolved against Chessman in *People* v. *Chessman* (1950), *supra,*

35 Cal.2d 455, 458, 460-464, and in the petition for habeas corpus denied by minute order on June 12, 1950 (Crim. 5110), certiorari denied, 340 U.S. 840 [71 S.Ct. 29, 95 L.Ed. 616], and was again considered and again resolved against Chessman in *People* v. *Chessman* (1951), *supra*, 38 Cal.2d 166, 172, certiorari denied, 343 U.S. 915 [72 S.Ct. 650, 96 L.Ed. 1330], rehearing denied, 343 U.S. 937 [72 S.Ct. 773, 96 L.Ed. 1344]; see also *Chessman* v. *People* (1953, C.A. 9), *supra*, 205 F.2d 128, 129, 131, certiorari denied, 346 U.S. 916 [74 S.Ct. 278, 98 L.Ed. 412], rehearing denied, 347 U.S. 905 [74 S.Ct. 430, 98 L.Ed. 1066].

As a part of the records of this court it further appears that on August 3, 1954, there was mailed to the clerk of the Supreme Court of the United States a letter purporting to be signed by Jerome A. Duffy, one of present counsel for Chessman, stating, among other things, the following: "Enclosed herewith you will please find the following record in support of a Petition for Writ of Certiorari on behalf of the above named condemned man [Caryl Chessman]:

"(1) Certified copy of Petition for Writ of Habeas Corpus —Criminal #5632 Supreme Court of California;

"(2) Certified copy of Judgment denying the above petition;

"(3) Certified copy of Order Staying Execution;

"(4) Certified copy of Opinion of Mr. Associate Justice Jesse W. Carter in support of Order Staying Execution . . ."

We are of the view that it is the duty of this court to see to it that an order and opinion certified to the Supreme Court of the United States under the seal of this court shall be accurate and adequate in stating facts which are matters of record materially affecting the proceeding for which review is sought, or that by appropriate action, such as the filing and certifying of this opinion, there shall be added to the record on application for certiorari an adequate and accurate statement of the facts of record.

Inasmuch as it appears that Justice Carter in making the order now under consideration relied upon the representation or assumption that, as stated by him, "It appears from said application that the alleged fraudulent procurement of said transcript was not known to petitioner until June of this year [1954] and the facts in connection therewith were never presented to any court until the petition for a Writ of Habeas Corpus was filed in the Supreme Court of California on July

16th, 1954,'' whereas, in fact, as is also shown in the judicial records and proceedings hereinabove cited, Chessman had alleged fraudulent procurement of the transcript and that he possessed both knowledge and proof thereof as early as the year 1949 and that during the years 1949 and 1950 what Chessman asserted were the ''facts in connection therewith'' were presented to at least five courts, including the superior court, this court, the federal district court, the United States Court of Appeals, and the Supreme Court of the United States, and that the attack on the transcript was again reiterated in later proceedings both before this court and the Supreme Court of the United States, and that in every instance and in every court the charges against the transcript and its method of procurement had been rejected either as not substantiated in fact or as presenting no legal ground for setting aside of the verdict or the judgments which had been imposed, we are impelled to the conclusion that this opinion detailing the matters of record above related should be filed.

Inasmuch as Justice Carter's stay order, regardless of whether the present motion be granted or denied, has already had the effect of postponing the execution of the defendant Chessman for at least 60 days following any ruling on the People's motion,[3] and inasmuch as in the regular course of its business the Supreme Court of the United States prior to the expiration of that period presumably will have acted upon the defendant's petition for certiorari, it appears unnecessary for us to determine, and we therefore refrain from determining, whether the court has power to vacate the stay issued by Justice Carter under title 28, U.S.C., § 2101, paragraph (f).

Solely for the reasons above stated, and not in any sense by way of approval of the stay order, the motion to vacate the stay of execution is denied. A copy of this opinion and order shall forthwith be certified by the clerk and transmitted to the Supreme Court of the United States as a part of the records of this court in the matter of the application of Caryl Chessman for a writ of habeas corpus and for stay of execution, which application was denied by the court on July 21, 1954, and subsequent to which denial the stay order and

[3]Section 1227 of the Penal Code provides, ''If for any reason other than the pendency of an appeal a judgment of death has not been executed, and it remains in force, the court in which the conviction was had shall, on application of the district attorney, or may upon its own motion, make and cause to be entered an order appointing a day upon which the judgment shall be executed, which must not be less than sixty days nor more than ninety days from the time of making such order . . .''

opinion of Mr. Justice Carter were filed, and the People's motion to vacate such order was presented, as related in the foregoing opinion.

Gibson, C. J., Shenk, J., Traynor, J., and Spence J., concurred.

EDMONDS, J.—I concur in the order denying the motion to vacate the stay of execution and in the statement of the record upon which this court denied Chessman's last petition for habeas corpus. However, I adhere to the conclusions stated by me in *People* v. *Chessman,* 35 Cal.2d 455 [218 P.2d 769, 19 A.L.R.2d 1084], and *People* v. *Chessman,* 38 Cal.2d 166 [238 P.2d 1001], concerning the record on appeal which was considered in each of those cases.

In the first of these cases the court said: "We perceive no legal impropriety and no unfairness in placing on an appellant in the situation of Chessman the burden of showing either prejudicial error in the record or that the record is so inadequate that he is unable to show such error. Inconsequential inaccuracies or omissions in a record cannot prejudice a party; if in truth there does exist some consequential inaccuracy or omission, the appellant must show what it is and why it is consequential." (P. 462.) As I there stated, I do not agree with that holding, but it is a judicial determination against Chessman upon the question which he is attempting to relitigate. Even if it be assumed that in his most recent petitions Chessman stated facts not previously presented to this court, he has made no attempt to meet the requirements laid upon him by the prior decisions.