[Crim. No. 8374.    In Bank.    May 24, 1966.]

In re BOBBY LOKEY on Habeas Corpus.

Bobby Lokey, in pro. per., Thomas C. Perkins, under appointment by the Supreme Court, Frances Newell Carr and Perkins, Carr & Anderson for Petitioner.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Jennifer L. Bain, Deputy Attorney General, for Respondent.

BURKE, J.—Petitioner was indicted for the murder of Ian Shuttleton and for kidnaping him for the purpose of robbery with bodily harm. Throughout the proceedings on the indictment he was represented by Public Defender Cole (now a superior court judge) and by Assistant Public Defender Salamy. Petitioner first pleaded not guilty but later changed his plea to guilty to both charges. He waived a jury trial on the issue of penalty, and after a hearing on that issue the trial judge sentenced him in November 1962 to life imprisonment for the murder and life imprisonment without possibility of parole for the kidnaping. No appeal was taken.

Thereafter petitioner, who is confined at San Quentin, brought the instant habeas corpus proceeding, contending in part that his pleas of guilty were not free and voluntary because they were the fruit of involuntary confessions. We issued an order to show cause, appointed counsel to represent petitioner, and appointed the Honorable B. F. Van Dyke, retired Presiding Justice of the District Court of Appeal, Third Appellate District, as referee to take evidence relating to specified questions including, among others, the following:

1. Was an involuntary confession or admission obtained from petitioner by any representative of the People before he entered his guilty pleas?

2. Were his guilty pleas freely and voluntarily made?

Following an evidentiary hearing the referee determined that the confessions and admissions obtained from petitioner were voluntary and that his pleas of guilty were freely and voluntarily made.

The evidence introduced at the penalty trial of the circumstances surrounding the crimes may be summarized briefly as follows: On August 14, 1962, Ian Shuttleton, his wife, and their young child parked near Sacramento to spend the night in their trailer while on a vacation. About midnight they were awakened by a knock, and at the command, ''Open up. This is the law,'' Mr. Shuttleton opened the trailer door. Petitioner

entered with a gun in his hand; his brother, Galen Lokey, stood near the door. After Mr. Shuttleton handed over the keys to his car at petitioner's demand, petitioner forced him into a closet. Galen Lokey began driving the car with the trailer attached, while petitioner remained in the trailer with the Shuttletons. Petitioner asked Mrs. Shuttleton for money. According to her testimony, he then began to molest her, and when she screamed her husband broke out of the closet. During the ensuing struggle petitioner's gun was fired, the bullet going through his own shoulder and into Mr. Shuttleton. A few hours later Mr. Shuttleton died from the wound.

From the evidence introduced at the reference hearing it appears that around midnight on August 15, 1962, petitioner was arrested at his home. He was taken to the sheriff's office, where he was interrogated by two officers. At first he denied having committed the murder and the kidnaping but subsequently confessed to both crimes. Thereafter about 6 o'clock on the same morning a deputy district attorney talked with petitioner at the sheriff's office, and petitioner again confessed. The deputy district attorney then took petitioner to the trailer where petitioner reenacted the crimes and made additional incriminating statements.

There are sharp conflicts in the evidence with respect to some of the circumstances surrounding petitioner's statements. He testified to the following version of what had occurred: He was interrogated for five to six hours before he confessed to the officers, and during this period he repeatedly asked to see an attorney and was told that he could see one after he signed a confession. He informed one of the interrogating officers that he thought he had a right "to stand on the Fifth Amendment." He had heard this expression used and believed it meant that "you . . . didn't have to say anything." When he mentioned the Fifth Amendment, the officer struck him with "something hard" on his forehead, and his nose began to bleed. The officer also made threatening gestures towards him. The other officer told him that if he did not tell them about the crime his entire family, including his pregnant wife, would be put in jail and his child would be sent to a receiving home. After he confessed, the officers took him to see the deputy district attorney, and one of the officers remained in the room for a while. The deputy district attorney did not hit him or threaten to do so or to arrest his family but told him that he had already given one statement and the best

thing for him to do was to cooperate further.[1] He would not have signed the confession at the interview with the deputy district attorney had it not been for the prior force and threats by the officers. Petitioner told Mr. Cole, who represented him, about the physical abuse he had received.

Galen Lokey was called as a witness by petitioner and testified that during interrogation at the sheriff's office he was told petitioner had confessed, that he said he wanted to see petitioner, that petitioner was then brought in, and that petitioner had fresh blood under his nose and on his lip. Petitioner's mother and sisters testified that when they visited him in jail a few days after his arrest they noticed a bruise on his forehead and thought his nose was swollen. Petitioner's wife testified that at her home on the night of the arrest officers told her that if she did not tell them all she knew about what had occurred they would put her in jail and send her child to a receiving home.

The officers who interrogated petitioner testified that he was questioned between one and two hours before he confessed and that he did not request to see an attorney and was not told that he could see one only after he confessed. They denied that he was hit or physically abused and stated that no threatening gestures were made, that a threat was not made to arrest his family, and that no threats were made to him. They further testified that he did not mention the Fifth Amendment. One of the officers said petitioner probably "was frightened from talking to [them]"; the other officer said that petitioner did not appear to be frightened.

Officers who were present when Galen Lokey saw petitioner testified that petitioner's nose was not bleeding at that time or at any time while he was at the sheriff's office. An officer who talked to petitioner's wife on the night of the arrest testified that he did not threaten to arrest her or to take her children away from her and that no one made any threats to her in his presence. Another officer who also talked to her that night similarly testified that he did not threaten to arrest her.

Mr. Cole, petitioner's attorney at the trial, testified that he questioned petitioner as to whether the officers had used any duress and that petitioner said nothing to him about physical brutality by the officers—that petitioner said he was hit on the head but that it was the witness's impression this occurred in

[1]The deputy district attorney denied making such a statement. He stated, however, that in questioning petitioner he referred to petitioner's statement to the officers.

the fight with Mr. Shuttleton. When asked whether petitioner mentioned any threats made at the time of his initial confession, Mr. Cole replied that the only thing he said was that he was fearful that his wife and child would be "taken in" because at the time of his arrest the officers questioned his wife and she said that they said "they would take her down."

Mr. Cole further testified that the reason petitioner gave him for having confessed was that "he was glad the police had got him, that he was sick all night after it happened and if they hadn't got him he would have come down and confessed himself. He said he hadn't been able to eat all night or after it happened."

Petitioner similarly told the deputy district attorney at the interview shortly after his arrest that he decided to tell the officers the truth because his conscience would not let him rest and he could not sleep. His confession to the deputy district attorney also included denials that when he was questioned by the officers he had been threatened by them or physically abused or forced to say anything against his will. He stated at the reference hearing that he made such denials in response to "rhetorical questioning." At the penalty trial he testified that there was nothing that he would change substantially in his confession to the deputy district attorney. At the reference hearing he explained that he gave this false testimony at the penalty trial on the advice of his attorney, Mr. Cole. Mr. Cole denied having given petitioner such advice.

It is undisputed that petitioner was not advised of his rights to counsel and to remain silent before he confessed and that he had no attorney present during the questioning. Petitioner admitted that he had been arrested probably 40 or 50 times but said that he was never advised of his "rights" when he was arrested. He was 22 years old at the time of the crimes here involved and had a 10th grade education.

The evidence further shows that when petitioner was questioned following his arrest he had a bullet wound in his shoulder, which apparently had been inflicted during the fight with Mr. Shuttleton. Petitioner did not complain to the interrogating officers of any discomfort from the wound and told them that the wound was clean, that he had treated it himself, and that he had not gone to a doctor. He did not appear to them to be in pain, and the wound was not bleeding. The deputy district attorney was also aware of the wound when he talked with petitioner. At the interview petitioner appeared to the deputy district attorney to be "somewhat pale" but did not seem to be very seriously wounded and did not complain

of the wound hurting him. About 8:30 a.m. on the day he confessed petitioner was taken to the county hospital where his wound was cleansed and irrigated under a local anesthetic.

■ The referee's determination that petitioner's confessions and admissions were voluntary is supported by substantial evidence and although not binding on this court is entitled to great weight (*In re Seiterle,* 61 Cal.2d 651, 657 [39 Cal. Rptr. 716, 394 P.2d 556]; *In re Imbler,* 60 Cal.2d 554, 562 [35 Cal.Rptr. 293, 387 P.2d 6]; *In re Jones,* 57 Cal.2d 860, 864 [22 Cal.Rptr. 478, 372 P.2d 310]) and is adopted by this court. His claims of physical brutality and threats were flatly denied by the officers and were inconsistent with his own prior statements. His statements to his own attorney and to the deputy district attorney are persuasive evidence that the reason he confessed was his revulsion and remorse for what he had done and not because of coercion or fear.

We need not consider whether the confessions and admissions were improperly obtained under the rules in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], because those decisions were not rendered until after the judgment against petitioner became final. (*In re Lopez,* 62 Cal.2d 368, 372 [42 Cal.Rptr. 188, 398 P.2d 380].)

■ At the reference hearing petitioner also sought to establish that his pleas of guilty were not free and voluntary because they were induced by coercion of the public defender who represented him. Petitioner testified to the following effect: His pleas of guilty were involuntary because, among other things, his attorney, Mr. Cole, stated that he would "wash his hands of the whole matter" unless guilty pleas were entered, and petitioner understood this to mean he would probably be "thrown to the dogs" and did not know he would get another attorney. Mr. Cole also told him he would go to the gas chamber if he did not plead guilty. Mr. Cole further said that petitioner would receive a "life sentence" after he pleaded guilty and did not tell him that the least punishment he could receive for the kidnaping was life imprisonment without possibility of parole.

Mr. Cole testified that he advised petitioner to plead guilty but the final decision to do so was petitioner's and that he never made any threats or promises to petitioner in connection with entering a guilty plea. He denied having made any statement to petitioner to the effect that he would wash his hands

of the case unless petitioner pleaded guilty. When asked if he told petitioner that it would be more likely that he would get the death penalty if he did not plead guilty, Mr. Cole replied, "No, I didn't tell him in those words. I told him I thought the chances of him getting the death penalty were pretty good." Mr. Cole also said that he discussed with petitioner the possible sentences he might receive, and the transcript of the court proceedings when petitioner changed his pleas to guilty shows that the trial judge likewise correctly advised petitioner of the possible penalties for the offenses and that petitioner said he understood.

The referee's determination that petitioner's guilty pleas were free and voluntary is amply supported by the record, and we adopt it.

Petitioner finally asserts that the gun used in the commission of the murder and the kidnaping was obtained in an unlawful search, that the gun was one factor that caused him to plead guilty, and that it was introduced into evidence at his penalty trial. Habeas corpus, however, is not available to challenge the use of evidence obtained by an unconstitutional search and seizure. (*In re Sterling,* 63 Cal.2d 486, 487-488 [47 Cal.Rptr. 205, 407 P.2d 5]; *In re Shipp,* 62 Cal.2d 547, 550 [43 Cal.Rptr. 3, 399 P.2d 571]; *In re Lessard,* 62 Cal.2d 497, 503-504 [42 Cal.Rptr. 583, 399 P.2d 39]; see *In re Harris,* 56 Cal.2d 879, 880 [16 Cal.Rptr. 889, 366 P.2d 305] [concurring opinion].) The fact that here, unlike the cited cases, petitioner contends that his guilty pleas rested in part upon evidence obtained in an unlawful search does not warrant a departure from the rule set forth in those cases.

Moreover, even if petitioner's claim with respect to the legality of the search could properly be raised in the instant proceeding, it appears to be without merit. After Galen Lokey told the police that the gun was at his mother's home two officers went there about 5 a.m. on August 16, 1962. They did not have a search warrant. The officers testified as follows: They knocked on the door, and when Galen's mother, Mrs. Worsham, answered they asked permission to enter and told her they wanted to get the gun. She said that "if you know where the gun is, come on in. I don't know nothing about it." She consented to their taking the gun out from a place in the wall where it had been hidden. Mrs. Worsham testified that the officers did not ask permission to enter and look for the gun but told her they had come for the gun and were going to get it if they had to take the house down board by board. She said that she merely shrugged her shoulders and did not

protest because she thought they might have authority to make the search. Her testimony was corroborated by her daughter. The officers denied having told her they would take the house down board by board if necessary to get the gun. The referee determined that Mrs. Worsham granted the officers permission to take the gun and that the gun was legally obtained.

The order to show cause is discharged and the petition is denied.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Mosk, J., concurred.

Petitioner's application for a rehearing was denied June 22, 1966.