[Crim. No. 13949. In Bank. May 24, 1971.]

In re DOYLE ALVA TERRY on Habeas Corpus.

912

## COUNSEL

Doyle Alva Terry, in pro. per., and Roger S. Hanson, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

## OPINION

**BURKE, J.**—In 1959 Doyle Alva Terry was convicted on two counts charging lewd acts upon Richard and Timothy respectively, each a child under 14 (Pen. Code, § 288) and one count of infamous crime against nature committed against Timothy (Pen. Code, § 286). The judgment was affirmed. (*People* v. *Terry* (1960) 180 Cal.App.2d 48 [4 Cal.Rptr. 597] [hg. den., cert. den. 364 U.S. 941 (5 L.Ed.2d 372, 81 S.Ct. 458)].) In 1960 Terry was found guilty of first degree murder for killing Police Officer Vernon Owings (Pen. Code, §§ 187, 189), conspiracy to commit robbery (Pen. Code, § 182), and five counts of first degree robbery (Pen. Code, §§ 211, 211a). We affirmed the judgment except the determination of penalty for the murder. (*People* v. *Terry* (1962) 57 Cal.2d 538 [21 Cal.Rptr. 185, 370 P.2d 985] [cert. den. 375 U.S. 960 (11 L.Ed.2d 318, 84 S.Ct. 446)].) Upon a penalty retrial the jury again imposed the death penalty, and we again reversed that penalty. (*People* v. *Terry* (1964) 61 Cal.2d 137 [37 Cal.Rptr. 605, 390 P.2d 381] [cert. den. 379 U.S. 866 (13 L.Ed.2d 68, 85 S.Ct. 132)].) The third penalty trial resulted in a mistrial. At the fourth penalty trial a jury again fixed the penalty at death, and we reversed that penalty under the compulsion of *Witherspoon* v. *Ilinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. (*People* v. *Terry* (1969) 70 Cal.2d 410 [77 Cal.Rptr. 460, 454 P.2d 36] [cert. den. 399 U.S. 911 (26 L.Ed.2d 566, 90 S.Ct. 2205)].)

Terry is currently confined at San Quentin pursuant to the 1959 and 1960 judgments of conviction. He was awaiting his fifth penalty trial for the murder when he filed the instant habeas corpus petition attacking both the 1959 and 1960 judgments on various grounds. We issued an order to show cause and stayed the penalty retrial "[p]ending final determination of this matter." We have concluded that the 1960 judgment is valid but that the 1959 judgment must be set aside for the reasons hereinafter set forth.

## I. VALIDITY OF 1960 CONVICTION

A. *Asserted Error in Use of 1959 Conviction for Impeachment Purposes.*

At the trial for murder, robberies, and conspiracy to commit robbery Terry on cross-examination by the prosecutor admitted having been convicted in 1959 on two counts of molesting children and one count of sodomy. The instructions given by the court informed the jury that "a witness may be impeached . . . by proof that he has been convicted of a felony." Terry contends, apparently for the first time, that the testimony of his 1959 conviction was inadmissible, since that conviction was assertedly invalid under *Barber* v. *Page,* 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318]. The reason for his apparent delay in presenting this contention undoubtedly is that *Barber* v. *Page* was not decided until 1968 and *Berger* v. *California,* 393 U.S. 314 [21 L.Ed.2d 508, 89 S.Ct. 540] (making *Barber* v. *Page* "fully retroactive") was not decided until 1969, although he does not so state. (See *In re Swain,* 34 Cal.2d 300, 302, 304 [209 P.2d 793].)

■ "We have repeatedly held that prior convictions obtained in violation of *Gideon* v. *Wainwright,* . . . 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733], cannot be used for impeachment or any other purposes. (*In re Woods* . . . 64 Cal.2d 3 [48 Cal.Rptr. 689, 409 P.2d 913]; *In re Luce* . . . 64 Cal.2d 11 . . . ; *In re Tucker* . . . 64 Cal.2d 15 [48 Cal.Rptr. 697, 409 P.2d 921]; *People* v. *Coffey* . . . 67 Cal.2d 204 [60 Cal.Rptr. 457, 430 P.2d 15]; *In re Caffey* . . . 68 Cal.2d 762 . . . .) An accused cannot be forced to suffer anew from the earlier deprivation of his Sixth Amendment right. (*Burgett* v. *Texas* . . . 389 U.S. 109, 115. . . .)" (*In re Dabney* (1969) 71 Cal.2d 1, 6 [76 Cal.Rptr. 636, 452 P.2d 924].) ■ Similarly a prior conviction invalid under *Barber* v. *Page* cannot be used for any purpose.

However, even if it be assumed (1) that Terry's 1959 conviction is invalid under *Barber* v. *Page, supra,* 390 U.S. 719, and (2) that the rule here enunciated prohibiting the use of such a prior conviction applies retroactively to Terry's guilt trial, reversal of the judgment, as we shall see is not required. ■ The introduction into evidence of an unconstitutional prior conviction is not prejudicial per se, and in assessing the prejudicial effect of such an error we must apply the test enunciated in *Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824], namely whether the prosecution has proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*In re Dabney, supra,* 71 Cal.2d 1, 6-8; *People* v. *Coffey, supra,* 67 Cal.2d 204, 219.) *Dabney* further declared (at p. 8) that ". . . only the most compelling showing can justify finding such error harmless beyond a reasonable doubt."

Here the prosecution has made such a showing. In addition to Terry's testimony of the 1959 conviction there was evidence that he was convicted in 1947 of armed robbery, and this latter conviction was emphasized by the prosecutor in his closing arguments as a basis for impeaching Terry's testimony on the stand. Although Terry now urges that the evidence regarding the 1947 conviction was inadmissible because he, assertedly, had received a pardon for that offense, as hereinafter appears, the court did not err in admitting that evidence.

Also the jury was instructed that the presumption of truth-telling on the part of a witness may be repelled by the interest of the witness in that case or by contradictory evidence. Terry's interest in the case is manifest, and, as shown hereinafter, there is extensive and convincing evidence contradictory to his testimony at the trial.

At the trial Terry admitted shooting Police Officer Owings but claimed that it was an accident and denied committing any of the robberies testified to or conspiring with anyone to commit robbery.

Terry's version of the circumstances surrounding the shooting was as follows: On June 24, 1960, Ross Wilson persuaded him to help get rid of a Cadillac, which was owned by Wilson and had been the subject of a police inquiry. Wilson drove the Cadillac and Terry followed in his Chrysler. After reaching Terminal Island, they stopped along the road. While working to remove the battery from the Cadillac, Wilson saw an approaching police car and got panicky because there was a gun under a sweater in the Cadillac. Terry picked up the gun with the sweater over it to put it in the trunk of the Chrysler. Officer Owings came over and asked what Terry had, and Terry replied "nothing" and proceeded to the back of the car and raised the trunk. Owings "made a jump" towards Terry, and Terry "pulled back the sweater and the gun went off." The shooting was not intentional, and he did not remember pulling the trigger. Officer Brizendine (Owings' partner) started shooting, and Terry had the gun in his hand and shot back. He must have "cocked the hammer back" before returning Brizendine's fire. At one point he looked under an auto at Brizendine, Brizendine shot at him, and he guessed he shot at the officer. He and Wilson drove away from the scene. After letting Wilson out of the car, he drove on. The police pursued and captured him.

Terry also denied that he had laughed about killing the officer, as Wilson testified at the trial in reporting their conversation while in custody on July 11, 1960.

The prosecution called to the stand two eyewitnesses to the events at the scene of the shooting. The first such witness, Officer Brizendine, testified:

About 6 p.m. on June 24, 1960, he and Officer Owings were driving in a police car on patrol duty in the area of the Terminal Island Naval Station. On seeing the hood of the Cadillac up, they stopped to give assistance. Brizendine walked forward to the Cadillac, where Wilson was standing. Owings walked the opposite direction toward Terry. While talking to Wilson, Brizendine heard a shot, and as he turned he saw Owings falling and Terry with a gun in his hand, shooting in the direction of Brizendine. Brizendine felt he had been shot, drew his gun, and fired at Terry. Brizendine then fired at Wilson. The officer did not know whether Wilson had a gun but does not now believe Wilson had one. Brizendine went behind a Ford parked at the scene, and Terry looked under the Ford and shot at Brizendine; and Brizendine returned the fire. Terry fled in the Chrysler, and as he backed out drove over Owings' legs. Brizendine radioed for police assistance. He noticed that Owings' gun was still snapped in the holster.

The other prosecution eyewitness to events at the scene of the shooting was Ross Wilson, who had been jointly charged with Terry for the murder, robberies and conspiracy to commit robbery but who near the close of the prosecution's case pleaded guilty to counts one (conspiracy to commit robbery) and four (robbery of Morris Danielson) and testified for the People. At the time of his testimony he had an application for probation pending; he admitted two prior felony convictions. Wilson testified: On the day the officer was shot Terry drove the Cadillac, which Wilson had sold to Terry several months before, and Wilson drove the Chrysler. Wilson did not know that Terry had a gun with him that day. After Brizendine stopped to talk with him, he heard a shot. He then saw Owings fall and saw Terry with a gun in his hand shoot a second time. After the second shot Brizendine pulled out his gun. Terry then fired a third shot this time in the direction of Brizendine, and Brizendine returned the fire.

With respect to the shooting, the prosecution also presented rebuttal evidence that it required four pounds of pressure to fire the death weapon and testimony by a firearms expert to the effect that a gun of that type would not fire unless the trigger was pulled or the gun was fired electrically. The expert also testified regarding an experiment he conducted with such a revolver. He arranged to have the gun go off electrically without pulling the trigger, while the gun lay on a material that had "basically" the same "coefficient of friction" as his hand. Under those conditions the recoil action was such that the gun was thrown back 40 inches or more and pushed back 5 to 6 inches a milk carton weighing 20 or more pounds. If a person held the gun loosely with fingers or a thumb wrapped around it and was not expecting it to fire, the recoil action if the gun fired would cause the gun to fly out of the person's hand.

It was the prosecution's theory that Terry shot Owings to avoid arrest (1) for a series of robberies committed in this state over a three-year period and (2) on a warrant charging him with child molesting and furnishing narcotics to a minor. In January 1960, the police acting on charges by two youths that Terry committed the latter offenses, went to Terry's Garfield Place apartment, found Terry and Wilson there, searched the apartment and Terry's car, and found narcotic paraphernalia in the car. Terry and Wilson fled from the apartment on this occasion, and a warrant was issued for Terry's arrest. Evidence was presented of his knowledge of the warrant. Among other things, a letter from his attorney was found at his Ben Street address reporting the warrant. Terry admitted having received the letter but stated that he did not think there was a warrant because many times when he had been arrested he had been told there was a warrant and had later been released.

As stated in our opinion on Terry's first automatic appeal (*People* v. *Terry, supra,* 57 Cal.2d 523, 546), "the prosecution presented evidence establishing a conspiracy to commit robberies existing between defendants Terry and Wilson as well as with certain other persons—Richard Vashon, Jack Corser and Chuck Stanford—a five-man gang operating mainly in the Los Angeles-Hollywood area. . . . Vashon, Corser and Stanford were in court during the trial for purposes of identification with various robberies." The evidence is very extensive. It is set forth in part in our previous opinion (57 Cal.2d 538), and need not be detailed here in full.

In brief there was evidence of the five robberies charged and of numerous additional robberies that were held relevant to show Terry's motive in shooting Officer Owings. The general modus operandi was the use of a stolen car with a change of license plates to thwart detection. Two men perpetrated each of the robberies, and most of the victims were businessmen (including market managers) en route to or from a bank. In each instance money was taken from the victim at gunpoint, and in some instances there was brutality.

Wilson testified that he and Terry committed two of the robberies, that he observed Terry commit one of the robberies with Stanford, and that Terry admitted committing some of the robberies with Vashon or Corser and discussed committing other of the robberies with different members of the gang.

With respect to several of the robberies a victim or bystander gave testimony tending to identify (with varying degrees of certainty) Terry as one of the robbers, and there was similarly eyewitness identification evidence regarding Wilson, Vashon, Corser, and Stanford. Witnesses also testified

to having seen Terry and different members of the gang "casing" markets and banks before robberies were later committed.

In a number of instances the robbers were described as wearing false mustaches or makeup. False mustaches, makeup, and a couple of empty revolver boxes were found by Terry's landlady in his Garfield Place apartment. The police also found false mustaches and beards at the Ben Street house, which was leased by Terry under the name of Warren Durfy. There was testimony by the landlord from which it can be inferred that Terry and Wilson jointly occupied this house. Terry testified that he had not moved into the Ben Street house at the time of his arrest on the murder charge, that all of his possessions were at another address except some canned goods and a box containing letters and similar items, and that he had not agreed to Wilson's occupying the premises with him but had permitted him to store his things there. At the Ben Street house the police also found, among other things, two license plates taken from a junked car or stolen, certain guns and ammunition, and a notebook containing a list of markets in Terry's handwriting. Terry testified that he made the list for a friend who was job hunting and that his friend copied the list rather than taking it with him. No such friend was called to testify.

Terry was identified as the person who purchased certain guns in January 1959, and a police officer testified that the guns, together with articles of facial makeup, were found in a briefcase in Vashson's apartment in July 1959. Terry testified that he liked to collect guns but that after his felony conviction he could not keep them and had therefore sold them to Vashon. There was also evidence that the murder weapon and a gun found at the Ben Street house leased by Terry had been purchased by Corser.

Terry admitted that he had not worked since the latter part of 1958 and that he made various substantial payments in 1959 and 1960 and had almost $500 cash in his pocket at the time of his arrest. No explanation was given by the defense as to the source of his funds. Substantial sums were taken in the robberies.

B. *Asserted Error in Use of 1947 Oklahoma Conviction for Impeachment Purposes*

Terry contends that it was error to admit at his *guilt trial,* over objection, evidence of his 1947 Oklahoma conviction for armed robbery because he had received a pardon for that offense. On his second automatic appeal we held that it was error to admit at the *second penalty trial,* over objection, evidence of that conviction—that pursuant to the full faith and credit clause of the federal Constitution Terry's pardon for that offense must be given the

same effect in California as it would have in Oklahoma and that the Oklahoma courts treat the pardoned defendant as a person not convicted of crimes. (*People* v. *Terry, supra,* 61 Cal.2d 137, 147-148.)

The instant contention was not made on Terry's first automatic appeal but was made in a habeas corpus petition that we denied.[1]

Even if it be assumed that the asserted error may be raised on a collateral attack and that there are special circumstances justifying Terry's failure to employ his remedy of appeal (see, e.g., *In re Lopez,* 2 Cal.3d 141, 151 [84 Cal.Rptr. 361, 465 P.2d 257]; *In re Shipp,* 62 Cal.2d 547, 552 [43 Cal. Rptr. 3, 399 P.2d 571]; *In re Dixon,* 41 Cal.2d 756, 759 [264 P.2d 513]), relief is not warranted. ■ As the return points out, Terry "did not secure documentation of the pardon [at his guilt trial] . . . ," and we are satisfied that the burden of proof of the pardon was on Terry. In general it would seem that evidence of a pardon is more available to a defendant than to the prosecution, and this is an important factor in deciding which party has the burden. (See Witkin, Cal. Evidence (1958) § 56, p. 74; cf. *People* v. *Davis,* 66 Cal.2d 175, 181 [57 Cal.Rptr. 130, 424 P.2d 682].) At the time of his objection to the prosecution's examination of Terry regarding the 1947 conviction defense counsel offered no proof in support of unsworn statements by him to the effect that he had unverified information from an attorney that Terry had received a pardon for that crime. Although after the objection was overruled, Terry testified that he had received a pardon, the trial court was, of course, not required to believe his testimony. It was presumed that "higher evidence would be adverse from inferior being produced." (Former § 1963, subd. 6, Code Civ. Proc.) Under the circumstances the court did not err in admitting at the guilt trial the evidence of the 1947 conviction.

■ Terry also complains that the 1947 conviction was not charged in the information. There is no requirement, however, that a conviction used as the basis for impeachment be charged as a prior conviction in the accusatory pleading. (*People* v. *Klavon,* 202 Cal.App.2d 765, 771 [21 Cal.Rptr. 99].)

## C. *Miscellaneous Additional Contentions*

■ At the guilt trial, over objection, the prosecution read the preliminary hearing testimony of Lee Jesme, who was outside the state at the time

---

[1]Where we have denied a petition for habeas corpus our policy is to deny a new application unless there has been a change in the facts or law (e.g., *In re Chessman,* 43 Cal.2d 391, 399 [274 P.2d 645]; *In re Horowitz,* 33 Cal.2d 534, 546 [203 P.2d 513]), but this policy is discretionary (*In re Bevill,* 68 Cal.2d 854, 863, fn. 9 [69 Cal.Rptr. 599, 442 P.2d 679]). The return does not rely on the foregoing policy, and, as we shall see, there is another ground for rejecting the contention.

of the trial, and Terry now asserts that the receipt of this testimony was improper under *Barber* v. *Page, supra,* 390 U.S. 719. Assuming, although not conceding, the receipt of the testimony to have been improper, we are satisfied beyond a reasonable doubt that the error did not contribute to the verdict obtained. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710].) Jesme's testimony was that in October 1959 he noticed license plates KUK 480 missing from his car. There was other evidence that a car with a license number beginning KUK was used in the robbery of Joe Smith on October 23, 1959, and that the day after the robbery a car with license number KUK 480 was found near the scene of the robbery. The robbery was not one of the robberies charged but was one of the numerous collateral robberies held relevant to Terry's motive in shooting Officer Owings. There was evidence that many stolen or abandoned license plates were on cars used in the various robberies. Under the circumstances it is inconceivable that Jesme's testimony affected the result of the trial.

At the guilt trial law enforcement officers testified: Several months before the murder they went to Terry's apartment after receiving a complaint from two youths that Terry offered the youths marijuana and tried to engage in certain lewd conduct. Additional evidence was presented that Terry fled from the apartment, that a warrant was issued charging him with molesting minors, furnishing narcotics to a minor, and possession of marijuana, and that Terry had knowledge of the warrant. The jury was instructed that evidence of those charges was admitted "for a limited purpose only, and that is not to prove the commission of the offenses nor to prove continuing criminality, but for such bearing, if any, as it might have on the question whether the defendant is innocent or guilty of the" murder. Terry now contends that since the two youths were not produced in court to testify he was denied his right of confrontation under the Sixth Amendment of the federal Constitution, made applicable to the states by the Fourteenth Amendment. (*Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065]; *Douglas* v. *Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074].) As we shall see, the contention lacks merit.

■ Confrontation serves to promote the discovery of the truth in the trial of a criminal action.[2] ■ Here the evidence of the youths' complaint

---

[2] As stated in *California* v. *Green,* 399 U.S. 149, 158 [26 L.Ed.2d 489, 497, 90 S.Ct. 1930], "Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth' [fn. omitted]; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility."

was not introduced to prove the truth of the matter asserted (i.e., that Terry committed the prior crimes) but rather was received "for such bearing, if any, as it might have on the question" whether Terry is guilty of the murder, and the jury was so instructed. In view of the limited purpose for which the evidence was received it was unnecessary to ascertain whether the youths' charges were true, assuming that the jury restricted its consideration of the evidence to the purpose for which it was admitted. (See 13 U.C.L.A. L.Rev. 366, 377.)

*Bruton* v. *United States,* 391 U.S. 123, 135 [20 L.Ed.2d 476, 484, 88 S.Ct. 1620], stated that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." In *Bruton,* wherein a codefendant did not take the stand and evidence was received of statements by him concerning the crime charged that were highly incriminating to the petitioner, the United States Supreme Court held that, despite instructions to the jury to disregard the statements in determining the petitioner's guilt or innocence, the introduction of the statements at a joint trial posed a substantial threat to the petitioner's right to confront the witnesses against him and that the receipt of the statements therefore violated the petitioner's right of cross-examination secured by the confrontation clause of the Sixth Amendment. Here, however, unlike *Bruton,* the youths' charges concerned prior crimes, not the very crime charged, and those charges were not "a vitally important part of the prosecution's case" (see *Frazier* v. *Cupp,* 394 U.S. 731, 735 [22 L.Ed.2d 684, 690, 89 S.Ct. 1420]). ■ Under some circumstances limiting instructions are sufficient to protect a defendant's constitutional rights (*Frazier* v. *Cupp, supra*), and this is such a case.

■ Terry also contends that the evidence of the youths' complaint and the warrant should not have been introduced at his guilt trial since, he alleges, he was never arraigned on those charges, nor did he have the assistance of counsel with respect thereto, nor was he convicted thereof. The alleged facts manifestly would not render the evidence inadmissible to show Terry's state of mind when he killed the officer.

Terry points to Wilson's testimony at the guilt trial that Terry made certain incriminating statements to him regarding the murder, and Terry claims that the court failed to comply with the procedure required by *Jackson* v. *Denno* (1964) 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205], to determine whether the statements were voluntarily made. However, at the guilt trial no question was raised as to the voluntariness of the statements. ■ "*Jackson* does not require the trial judge to hold a preliminary hearing sua sponte regarding the voluntariness of a defendant's

confession or admission; it merely deals with the procedure to be followed in determining the issue when it is raised by objection or otherwise. [Citations.]" (*Lundberg* v. *Buchkoe,* 389 F.2d 154, 157; in accord *Sellers* v. *Smith,* 412 F.2d 1002, 1005.)

Terry further claims that he was subjected to a lineup in circumstances so unnecessarily suggestive and conducive to irreparable misidentification as to fatally taint the bank teller's courtroom identification of him *at the guilt trial* as one of the men who committed the robbery at the Bank of America (one of the collateral crimes.)[3] ▆▆▆ Since Terry's first automatic appeal was decided before the decision in *Stovall* v. *Denno* (1966) 388 U.S. 293, 301-302 [18 L.Ed.2d 1199, 1205-1206, 87 S.Ct. 1967], he is entitled to raise the claim in the instant collateral proceeding. (*In re Hill,* 71 Cal.2d 997, 1004 [80 Cal.Rptr. 537, 458 P.2d 449].) Any failure to raise the claim at the guilt trial is excusable. (*In re Smith,* 3 Cal.3d 192, 199, fn. 2 [90 Cal. Rptr. 1, 474 P.2d 969]; *People* v. *Douglas,* 259 Cal.App.2d 694, 697 [66 Cal.Rptr. 492].)[4]

*Stovall* v. *Denno, supra,* 388 U.S. 293, a federal habeas corpus proceeding, held that although the petitioner could not avail himself of the right to counsel rule of *United States* v. *Wade, supra,* 388 U.S. 218, and *Gilbert* v. *California, supra,* 388 U.S. 263, since the rule was not retroactive, he would nevertheless be entitled to relief if he could "allege and prove" that "the confrontation . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." "[A] claimed violation of due process in the conduct of a confrontation depends on the totality of the circumstances surrounding it . . . ." (*Stovall* v. *Denno, supra,* at p. 302 [18 L.Ed.2d at p. 1206]; in accord *Coleman* v. *Alabama,* 399 U.S. 1, 4 [26 L.Ed.2d 387, 393, 90 S.Ct. 1999]; *Foster* v. *California,* 394 U.S. 440, 442 [22 L.Ed.2d 402, 406, 89 S.Ct. 1127]; cf. *Simmons* v. *United States,* 390 U.S. 377, 383 [19 L.Ed.2d 1247, 1252, 88 S.Ct. 967].)

---

[3]On his appeal from his fourth *penalty trial* we concluded that the evidence presented at that trial concerning the lineup did not show a denial of due process. (*People* v. *Terry, supra,* 70 Cal.2d 410, 423.) Terry now alleges additional facts bearing on the fairness of the lineup.

The lineup preceded the decisions in *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], and the right to counsel rule enunciated in those cases is therefore inapplicable. (*Stovall* v. *Denno, supra,* 388 U.S. 293, 296 [18 L.Ed.2d 1199, 1203]; *People* v. *Feggans,* 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21].)

[4]As noted in *People* v. *Douglas, supra,* 259 CalApp.2d 694, 696-697, before *Stovall* the rule was that "The manner in which the lineup was conducted affects only the weight of the witnesses' testimony, not its admissibility." (*People* v. *Parham,* 60 Cal.2d 378, 380 [33 Cal.Rptr. 497, 384 P.2d 1001]; in accord *People* v. *Diaz,* 66 Cal.2d 801, 804-805 [58 Cal.Rptr. 729, 427 P.2d 505].)

Here the bank teller's testimony at the guilt trial regarding the manner in which the lineup was conducted may be summarized as follows: About 50 or 60 observers attended "the lineup," which was held at the police department. Two groups, each consisting of five or six men, were shown. First one group was brought out and then the second group. None of the men were in both groups; so he saw a total of 11 or 12 men on that occasion.[5] He did not recall whether Terry was "in the first lineup or the second." The other men "in the lineup that [he] picked . . . Terry out of" were Wilson and "some younger boys . . . in their early 20's, possibly late teens." [Wilson was then about 24; Terry alleges he was then 34; and it may be inferred from the bank teller's testimony that he had described one of the robbers as in his thirties.] Before "the lineup" the police told the bank teller that "a man" in "the lineup" was wanted for shooting a policeman, but the police did not inform him who the man was or point out anyone to him. The police had "the men" step forward.

Terry alleges that before "the lineup" the bank teller was told that "the man in the lineup was wanted for murder" and that "the man [Terry] was singled out and asked to step forward." However, in support of his allegations Terry apparently relies on the bank teller's testimony since Terry quotes part of it and does not allege that he has other contradictory evidence, and it appears from that testimony, as shown above, that Terry's allegations are a gross distortion of the facts.

Terry further alleges that the bank teller told the police that one of the robbers was 30 to 35-years-old, 6 feet tall, 180 pounds, "pale-pasty" complexion, and wearing sportcoat, slacks, white shirt, and tie. From additional allegations by Terry it appears that, when the two groups were shown, he substantially fit that description, that four in the group he was in were substantially different from that description and that the sixth man in that group (Wilson) differed in some respects from that description.[6]

In *People* v. *Caruso,* 68 Cal.2d 183, 187 [65 Cal.Rptr. 336, 436 P.2d 336], wherein we concluded that the lineup was unduly suggestive, *none*

---

[5]It appears that the bank teller also attended other lineups. He testified that he "went to several different lineups. In the one where I made identification there were two lines . . . ." It also appears that he was shown about 2,500 pictures, out of which he picked three as "possibly" the man.

[6]Terry alleges: At the time of "the lineup" he was 34, 6 feet and ½ inch tall, and about 175 pounds, had "light brown" hair and a "paste white" complexion, and wore a sportcoat, slacks, white shirt, and tie. Wilson was 23, 6 feet tall, and about 160 pounds, had "dark hair" and a "medium" complexion, and wore a shirt and trousers but no coat or tie. Each of the remaining four were between 15 and 16, about 5 feet, 6 inches tall, and between 135 and 145 pounds, and wore a shirt and pants but no coat or tie. "[T]hree of the boys [*sic*] complexion appeared to be of mexican [*sic*] or of spanish [*sic*] descent; . . . the fourth boy appeared to be white in complexion."

of the other participants in the lineup besides the defendant were of his size or had his complexion or dark wavy hair. Here, unlike *Caruso,* from Terry's allegations it appears that one in the lineup approximated the defendant in size although he was dissimilar in some other respects from the defendant. (See fn. 6.) It also appears that here, unlike *Caruso,* the person making the identification was shown two lineups on the same occasion. Terry fails to allege matters such as the physical description of the men in the lineup in which he did not appear and whether the two lineups were virtually one with no interval between and with no identification made until after both groups were seen and whether each observer made any identification outside the presence of other observers. At least in the absence of allegations regarding such matters, it does not appear that the lineup in which Terry appeared was unnecessarily suggestive.

▮ Furthermore, the Bank of America robbery was merely one of the numerous collateral crimes shown by the evidence, and in view of the additional, extensive evidence of Terry's guilt of the crimes with which he was charged, any error in the receipt of the bank teller's testimony would be harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710].)

Terry argues that it was unconstitutional to prosecute him by an information for the murder rather than by an indictment because, assertedly, the Fifth Amendment of the federal Constitution via the due process clause of the Fourteenth Amendment required an indictment for that offense. ▮ However, it has long been the rule that a conviction upon an information does not violate due process. (*Hurtado* v. *California,* 110 U.S. 516, 538 [28 L.Ed. 232, 239, 4 S.Ct. 111]; *Morford* v. *Hocker,* 394 F.2d 169 [cert. den. 392 U.S. 944 (20 L.Ed.2d 1406, 88 S.Ct. 2329)]; *People* v. *Stephens,* 266 Cal.App.2d 661, 663 [72 Cal.Rptr. 317]; *People* v. *Hamilton,* 254 Cal.App.2d 462, 466 [62 Cal.Rptr. 261].) Neither *Benton* v. *Maryland,* 395 U.S. 784 [23 L.Ed.2d 707, 89 S.Ct. 2056], nor *Malloy* v. *Hogan,* 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct. 1489], cited by Terry, changed that rule. *Benton* and *Malloy* held that the provisions of the Fifth Amendment relating to double jeopardy and to the privilege against self-incrimination were incorporated into the Fourteenth Amendment.

▮ Terry contends that evidence introduced at his guilt trial was obtained by assertedly illegal searches and seizures. The writ is not available to attack a final judgment on this ground. (*In re Malloy,* 66 Cal.2d 252, 255 [57 Cal.Rptr. 345, 424 P.2d 929]; *In re Wright,* 65 Cal.2d 650, 652 [56 Cal.Rptr. 110, 422 P.2d 998]; *In re Lokey,* 64 Cal.2d 626, 632 [51 Cal.Rptr. 266, 414 P.2d 394]; *In re Sterling,* 63 Cal.2d 486, 487 [47 Cal.Rptr. 205, 407 P.2d 5]; *In re Lessard,* 62 Cal.2d 497, 503 [42

Cal.Rptr. 583, 399 P.2d 39].) Although a claim of an unconstitutional search and seizure by either a state or federal prisoner is cognizable in a collateral federal proceeding (*Kaufman* v. *United States,* 394 U.S. 217, 218 [22 L.Ed.2d 227, 232, 89 S.Ct. 1068]; *Mancusi* v. *De Forte,* 392 U.S. 364 [20 L.Ed.2d 1154, 88 S.Ct. 2120]), we need not afford a cognate collateral remedy in the state court (*In re Sterling, supra,* at p. 488).

Terry also makes several contentions regarding his guilt trial that were or could have been raised on his appeal. ■ Habeas corpus ordinarily cannot serve as a second appeal (*In re Eli,* 71 Cal.2d 214, 219 [77 Cal. Rptr. 665, 454 P.2d 337]; *In re Waltreus,* 62 Cal.2d 218, 225 [42 Cal. Rptr. 9, 397 P.2d 1001]), or as a substitute for an appeal (*In re Streeter,* 66 Cal.2d 47, 52 [56 Cal.Rptr. 824, 423 P.2d 976]; *In re Shipp, supra,* 62 Cal.2d 547, 552). Other contentions by Terry relating to the crimes of which he was convicted in 1960 are either sufficiently devoid of merit that discussion is unwarranted or do not affect the judgment.

## II. VALIDITY OF 1959 CONVICTION

A preliminary question is whether, as urged by the Attorney General, we should not adjudicate at this time the validity of the 1959 conviction. The Attorney General recognizes that habeas corpus is not limited to cases in which the petitioner is entitled to be discharged from custody (see *In re Rye,* 152 Cal.App.2d 594, 595 [313 P.2d 914]; Witkin, Cal. Criminal Procedure (1963) p. 762). The Attorney General points out, however, that, if the death penalty is imposed for the murder and carried out, the litigation with respect to the 1959 conviction will become moot, and he asserts that if the death penalty is not imposed it will be time enough to set aside the 1959 conviction if it is invalid, that after nearly a decade there would be little difference between retrying the case now or in a few more years. He states that "The disadvantage to setting aside the conviction is that it would tend to embroil the prosecution and petitioner in side issues and trials, dissipating the energies of both sides." And he notes that if we refrain from deciding the validity of the 1959 conviction, the prosecution at any future trial relating to the murder will have to make an appraisal of the risks and decide whether to prove the 1959 conviction, the underlying evidence, or both and that if the prosecution tries to establish the fact of conviction, petitioner can ask the trial court to exclude the evidence and a determination can then be made as to its admissibility. Terry opposes any delay in deciding the validity of the 1959 conviction.

The Attorney General has cited no authority directly in point supporting such a delay. He refers to decisions involving claims of multiple punishment in violation of Penal Code section 654 where it has been declared that no

useful purpose would be served by modifying the judgment in cases of improper multiple sentences for felonies that include a valid death sentence. (See *In re Wright, supra,* 65 Cal.2d 650, 654, and authorities there cited.) However, as he recognizes, those cases differ from the present one in that (1) there a valid death sentence had been imposed whereas here Terry is awaiting a penalty trial for the murder and (2) there the issue was the validity of the sentence rather than, as here, of the conviction.

We, of course, do not know what penalty will be imposed upon the penalty retrial, and it cannot be safely assumed that the same evidence pertaining to the crimes involved in the 1959 conviction will be available a few years from now that is available now. We have therefore concluded that we should consider the merits of Terry's claim that the 1959 conviction is invalid under *Barber* v. *Page, supra,* 390 U.S. 719. The Attorney General argues that the 1959 conviction is not invalid under that decision since, assertedly, there was substantial compliance with the rule enunciated therein.

 *Barber* v. *Page, supra,* 390 U.S. 719, held that the absence of a witness from the jurisdiction would not justify the use at trial of his preliminary hearing testimony unless the state had made a good-faith effort to secure the witness' presence.

*Barber* v. *Page, supra,* 390 U.S. 719, is "fully retroactive," (*Berger* v. *California, supra,* 393 U.S. 314, 315 [21 L.Ed.2d 508, 510]; *In re Montgomery,* 2 Cal.3d 863, 866-867 [87 Cal.Rptr. 695, 471 P.2d 15]; see *Jenkins* v. *Delaware,* 395 U.S. 213, 220-221 [23 L.Ed.2d 253, 260-261, 89 S.Ct. 1677]), and the Attorney General concedes "retroactivity is not available as a defense to the government" insofar as Terry attacks the 1959 conviction.

At Terry's preliminary hearing for the crimes resulting in the 1959 conviction Richard, then age 13, and Richard's brother, Timothy, then age 11, gave testimony highly incriminating to Terry and were cross-examined at that time by Terry's attorney. The boys did not appear at the trial and after extensive evidence was presented as to their whereabouts and reasons for their absence, which evidence is summarized immediately hereafter, their preliminary hearing testimony was read into evidence over objection.[7]

---

[7]At the time of Terry's trial under California law the preliminary hearing transcript of the children was admissible upon a showing that they were absent from the state or could not with due diligence be found within the state. (Pen. Code, § 686, subd. 3 [as it then read]; *People* v. *Terry, supra,* 180 Cal.App.2d 48.) Such a showing without more is, of course, insufficient under *Barber* v. *Page, supra.*

The record shows that in August 1958 Timothy and Richard were released by the juvenile home in Los Angeles to a probation officer to be transported to their father in Virginia. In the following month Terry's trial was scheduled for October 23, 1958. About a week before that date defense counsel informed an officer he intended to get a continuance. The officer stated that the boys were going to be in Los Angeles for a hearing in another case on October 21, and that it would be inconvenient to bring them out again from Washington, D.C. Defense counsel commented that another case (apparently involving the same boys) was set for a later date and that it would be just as easy to bring the boys out for all the trials at one time.

Before October 23, 1958, Edward Blodgett, a process server of the district attorney's office, received subpoenas for the two boys for that date. He ascertained from one of the investigating officers that the boys' address was a specified one in Virginia. Upon hearing that they would be in Los Angeles, he turned the subpoenas over to another process server. The latter, on October 21, 1958, in Los Angeles, served the subpoenas on the boys' father in their presence. On that same date the boys' father complained to Deputy District Attorney Manley Bowler about having to be in Los Angeles over an extended period and stated that he was a navy captain working on a secretive program in Washington and his children were in school. The father on that occasion appeared to be "very much beside himself." Bowler told him that there was nothing he could do about the father's having been served with the subpoenas but that there was "no use getting excited about this thing [then] because it might be that these cases would be disposed of other than by a trial, and that in that event . . . the children's presence . . . wouldn't be necessary." Bowler further stated "we will notify you by letter if and when these cases are actually going to go to trial . . . , and if you decide that at that time . . . the children aren't going to be here, and if you have in your mind an impelling reason why they should not be here, will you please write a letter to us and so indicate."

The children were not present in court on October 23, 1958, and upon mutual agreement a continuance was granted until December 4, 1958.

About mid-November 1958 Blodgett received subpoenas for Richard and Timothy for December 4, 1958, but made no attempt to serve the subpoenas since he had the same address for the boys in Virginia. On December 3, 1958, Blodgett telephoned the boys' father in Virginia and asked if he and his sons would be in Los Angeles on December 4 to testify at Terry's trial. The father replied that he would not be able to be there, that he would be in conference with the President of the United States, and that his children would be in school. He further stated that he could not

bring the children out in the near future or at any time, "that it had caused them too much embarrassment already and they were getting low grades in school because of all of this."

On December 4, 1958, a continuance was granted to the next day, and on December 5, 1958, the case was continued to January 28, 1959. During December Blodgett received subpoenas for the boys for January 28, 1959, but made no attempt to serve the subpoenas apparently because of his information that the boys were residing in Virginia.

The district attorney's office sent letters to the boys and their father, but the record does not disclose the contents of the letters.

On January 28, 1959, Deputy District Attorney Bowler telephoned the children's father in Washington, and the latter made comments of a similar nature to those he made to Blodgett in December. On January 29, 1959, Blodgett again called the father in Washington and in response to an inquiry where the children were the father replied at specified schools in Virginia.

The Uniform Act to Secure the Attendance of Witnesses From Without the State in Criminal Cases was in force in both California and Virginia at the time in question. (See Pen. Code, § 1334 et seq.; Va. Code (1950) former § 19-242 et seq.) Deputy District Attorney Howard, who handled Terry's case through December 1958, indicated that he did not consider the use of the procedure provided for in the Uniform Act, nor does it appear that any of the other prosecuting authorities ever attempted to secure the children's presence by means of the Uniform Act.

Under the Uniform Act a summons would have been issued by a Virginia court only if at a hearing the judge determined, among other things, "that it will not cause undue hardship to the witness to be compelled to attend and testify in the prosecution . . . in the other State." (See Va. Code (1950) former § 19-244.) The Attorney General points to the previously recited evidence regarding the father's position and to statements in a psychiatric report and a report by two psychologists regarding Timothy's and Richard's psychological problems as assertedly showing that it would have been an undue hardship to return the boys to California.[8]

---

[8] The psychologists' report states "There is reason to believe that Tim still bears serious psychological scars from his encounter with the perverts in California," and the psychiatric report concerning Richard concludes, ". . . this boy was very nervous, overstimulated, and definitely emotionally profoundly upset over this entire experience. I believe that definite emotional trauma has occurred to this youngster. It is difficult to estimate the complete extent of the effects of these experiences in the future personality functioning of the child. In my opinion, there will probably be some definite continuing effects."

However, the matters pointed to did not prevent the children testifying at Terry's preliminary hearing or thereafter being brought to California in connection with another case, and it cannot be said that a Virginia court would have necessarily found the existence of such hardship.

Although the prosecuting authorities obtained subpoenas, wrote letters to the children, talked to the father, and made telephone inquiries of him as to the children's whereabouts and whether they would attend the trial, it does not appear that the prosecuting authorities made any attempt to use the Uniform Act or to persuade the father to bring the children to California to testify. Accordingly, it was error to permit the testimony of the children to be read at Terry's trial. (*Barber* v. *Page, supra,* 390 U.S. 719; *People* v. *Bailey,* 273 Cal.App.2d 99, 105-106 [78 Cal.Rptr. 107]; *People* v. *Casarez,* 263 Cal.App.2d 130, 133 [69 Cal. Rptr. 187].)

The testimony constituted, in the words of the Attorney General, "the major part of the prosecution's case." The other prosecution evidence consisted primarily of testimony by a doctor pertaining to his observations during a physical examination of Timothy and evidence regarding conduct of Terry, such as that he told the police he did not know Timothy and Richard and remained silent when informed they had identified him. Under the circumstances it is clear that the prosecution has not met its burden of proving beyond a reasonable doubt that the error did not contribute to the judgment. (*Chapman* v. *California, supra,* 386 U.S. 18.)

The 1959 judgment (Los Angeles Superior Court No. 206208) is set aside. Terry is not entitled to release, since he is held under the valid 1960 judgment. The order to show cause is discharged, and the petition for habeas corpus is denied.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Sullivan, J., and Ford, J.,* concurred.

Petitioner's application for a rehearing was denied June 23, 1971. Mosk, J., did not participate therein.

---

*Assigned by the Chairman of the Judicial Council.