**Bob LOKEY et al.,**
**Plaintiffs-Appellants,**

v.

**H. L. RICHARDSON, etc., et al.,**
**Defendants-Appellees.**

**No. 74-1256.**

United States Court of Appeals,
Ninth Circuit.

Dec. 9, 1975.

---

Bob Lokey, in pro. per.

Don Jacobson, Asst. Atty. Gen., for the State of Cal., San Francisco, Cal., for defendants-appellees.

## OPINION

Before BROWNING and ELY, Circuit Judges, and ANDERSON,[*] District Judge.

BROWNING, Circuit Judge:

Appellant Lokey, a state prisoner confined in San Quentin serving a life sentence without possibility of parole, appeals the order of the district court granting summary judgment in favor of appellees in appellant's suit under the Civil Rights Act, 42 U.S.C. § 1983. The only issue before this court is whether summary judgment was proper on appellant's claim that the decision of the California Department of Corrections to rescind his minimum custody classification was made without procedural due process.[1]

Appellant's uncontroverted allegations depict him as a model prisoner who had achieved a minimum security status accorded few convicts. He entered prison with a sixth-grade level education. While in custody he completed both high school and two years of college, receiving an associate in arts degree with honors. In addition, he completed a two-year course in office machine technology, graduating at the top of the class, and a two-year institutional course in "creative dynamics." During his imprisonment he read widely in the field of human physiology and anatomy, and in the behavioral sciences. He became an accomplished artist. He invented an improved Braille typewriter and a variety of tools, including a safety power saw, and organized a corporation to manufacture and market his innovations. An institutional report states, "Mr. Lokey is described by custody officials as maintaining excellent standards within the institutional setting, especially since 1964. Everyone that he comes in contact with speaks highly of him and he is a trusted individual working in a minimum setting who received work grades from above average to exceptional." Because of his exemplary conduct appellant was given a minimum custody classification enjoyed by only 20 or 30 inmates of San Quentin. He was permitted to travel to points distant from the prison accompanied only by an unarmed security guard. He was second in command at the San Quentin firehouse, located outside the prison walls, serving surrounding communities as well as the institution. Most important, appellant's minimum security classification entitled him to participate in the Family Visiting Program, under which he was permitted to be with his wife and two children at overnight family visiting facilities outside the prison.

After two and a half years, appellant's minimum security status was abruptly terminated. He received no notice of the proposed change of status, and no hearing. He was given no reason for

[*] Honorable J. Blaine Anderson, United States District Judge, District of Idaho, sitting by designation.

1. Appellant also alleged that various California officials conspired to prevent commutation of appellant's sentence from life without possibil-ity of parole to life with possibility of parole. Most of the proceedings below related to this issue. Appellant has restricted this appeal to the issue stated in the text. Other appellants are Mr. Lokey's wife and two minor children. The appellants appear *pro se*.

the reclassification, orally or in writing.[2] The revocation of his minimum security classification terminated the various privileges referred to, including appellant's participation in the family visitation program.

Appellees filed three documents in support of their motion for summary judgment. The first is an internal memorandum dated November 2, 1972, from the Chief Deputy Director of the State Department of Corrections, to Classification and Parole Representatives. It reads:

> Effective this date, and pending revision of Chapter VI of the Classification Manual, no inmate serving life without possibility of parole is to be classified minimum custody without prior review and concurrence by the Departmental Review Board. Any cases now so classified should be submitted to the Departmental Review Board for their review and action.

The second document submitted by appellees is an interoffice memorandum dated December 15, 1972, from the Chief of Classification Services to the Chief Deputy Director. It reads:

> REASON FOR REFERRAL
>
> Subject referred to [Departmental Review Board] by San Quentin staff as a result of the Director's policy regarding minimum custody classification for inmates serving Life Without Possibility of Parole.
>
> [DEPARTMENTAL REVIEW BOARD] ACTION
>
> [Departmental Review Board] met on December 15, 1972. Following a detailed review of all case factors Lokey *not* approved for assignment outside security fence area.

The third document submitted by appellees is a page from the State Classification Manual, containing a revision reading: "Inmates serving life without possibility of parole are not to be classified minimum custody without prior review and concurrence by the Departmental Review Board."

A fourth document is attached to appellant's opposition to the motion for summary judgment. It is a letter dated April 24, 1973, from the Director of Corrections, Appellee Procunier, to appellant. The portion of the letter relating to termination of appellant's minimum custody status reads as follows:

> If you recall, the abolishment of the death penalty required the movement of many people with serious offenses and received much public attention. Shortly after that, a person having a Life Without Possibility of Parole sentence escaped from one of our institutions. The combination of issues demanded a removal of such cases from minimum assignments. A Classification Manual change has been made to make this a general order which was made flexible to permit meritorious cases minimum assignments by order of the Departmental Review Board only. Your case was presented to the Departmental Review Board on December 15, 1972 for that consideration; however, the manner [in which] you have handled the disappointment clearly indicates at this point that the decision to bring you inside the security area was a proper one.[3]
>
> I can understand the feeling you have expressed and the disadvantages you have received. Unfortunately, the order regarding the minimum assignments was made to change a condition

---

2. *See* note 3 *infra.*

3. Appellee Procunier's reference to "the manner [in which appellant] handled the disappointment" does not appear to be a statement of the reason for the termination of appellant's minimal security status. As the record document referred to in the text reflects, appellant's minimum security status was terminated December 15, 1972. Appellee Procunier, writing on April 24, 1973, states that appellant's reaction indicates "at this point" that the earlier termination decision was proper. Perhaps the reference was to the filing of the present suit on March 31, 1973, less than a month before Appellee Procunier wrote.

involving many people, and therefore must stand.

■ Appellees contend that these documents demonstrate that termination of appellant's minimal security status was a "purely administrative and nondisciplinary decision regarding the security of the institution," and resulted in the loss only of a "privilege." They argue that such a decision imposing such a loss does not require the procedural due process mandated by *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), for disciplinary proceedings resulting in loss of good-time credit.

Summary judgment on this ground was not proper. Appellees were not entitled to judgment "as a matter of law," Federal Rule of Civil Procedure 56(c), on the few uncontroverted facts reflected in this skimpy record.

■ The right to procedural due process turns upon whether there is an infringement of "liberty" (*Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)), not upon whether the deprivation is characterized as "administrative" rather than "disciplinary," or involves loss of a "privilege" rather than a "right." *Clutchette v. Procunier*, 510 F.2d 613, 615 (9th Cir. 1975).

Appellant alleges that termination of his minimal security status deprived him of highly significant privileges (including a familial relationship, especially protected by the law, *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)), and worsened the conditions of his imprisonment in a most serious and substantial way. Such losses could be imposed as punishment only by due process of law. *Clutchette v. Procunier, supra.* They constitute no less a loss of "liberty" protected by the due process clause when imposed for "administrative" reasons. *See, e. g., Cardaropoli v. Norton*, 523 F.2d 990, 995 (2d Cir. 1975);

*Urbano v. McCorkle*, 334 F.Supp. 161, 168 (D.N.J.1971), aff'd mem., 481 F.2d 1400 (3d Cir. 1973); *Stone v. Egeler*, 377 F.Supp. 115, 118 (W.D.Mich.1973), *aff'd as modified*, 506 F.2d 287 (6th Cir. 1974).

In *Cardaropoli*, the Second Circuit held that due process safeguards must be provided in the administrative classification of a newly admitted prisoner as a "Special Offender" or "Special Case." The Court of Appeals relied upon a district court finding that such a classification "delays or precludes social furloughs, release to half-way houses and transfers to other correctional institutions; in some cases, the characterization may bar early parole." 523 F.2d at 994, *citing Catalano v. United States*, 383 F.Supp. 346, 350 (D.Conn.1974). The Court of Appeals concluded, "[T]he marked changes in the inmate's status which accompany the designation create a 'grievous loss', *Morrissey v. Brewer, supra,* 408 U.S. at 481, 92 S.Ct. 2593; *Goldberg v. Kelly*, 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), and may not be imposed in the absence of basic elements of rudimentary due process." 523 F.2d at 995.[4]

Appellees argue, however, that the present case is controlled by prior decisions of this court holding that nonconsensual transfers of prisoners between institutions may be ordered without procedural protections. *Fajeriak v. McGinnis*, 493 F.2d 468 (9th Cir. 1974); *Hillen v. Director of Social Services & Housing*, 455 F.2d 510 (9th Cir.), cert. denied, 409 U.S. 989, 93 S.Ct. 331, 34 L.Ed.2d 256 (1972); *Duncan v. Madigan*, 278 F.2d 695 (9th Cir. 1960), cert. denied, 366 U.S. 919, 81 S.Ct. 1096, 6 L.Ed.2d 242, 368 U.S. 905, 82 S.Ct. 185, 7 L.Ed.2d 99 (1961). The opinions in these cases do not indicate that the conditions of confinement of the transferees were substantially

---

4. Appellant's entitlement to due process does not face an obstacle successfully overcome in *Cardaropoli* by the Second Circuit (523 F.2d at 995 n. 11): *Cardaropoli* sought procedural protection in the initial classification process; ap-

pellant seeks protection against the withdrawal of a status he has long enjoyed. *See* Friendly, *"Some Kind of Hearing,"* 123 U.Pa.L. Rev. 1267, 1295–96 (1975).

worsened by the transfers. As we recently noted, these cases hold only that nonconsensual transfers do not constitute a violation of due process standing alone. We added, "[H]owever we have also held that transfers to penalize prisoners for their religious beliefs [are] unconstitutional, *Fajeriak v. McGinnis,* 493 F.2d 468 (9th Cir. 1974), and have been careful to note that we reserve opinion upon any general procedural rule involving the due process implications of nonconsensual transfers." *Stinson v. Nelson,* 525 F.2d 728, 730 (9th Cir. 1975). *See also Tai v. Thompson,* 387 F.Supp. 912, 914 (D.Hawaii 1975).

 In concluding that the termination of appellant's minimal security status may have deprived him of "liberty" protected by the Due Process Clause, we have relied upon appellant's uncontradicted allegations as to the seriously adverse consequences flowing from the reclassification. This will be a matter of proof on remand.

If the court on remand concludes that a "liberty" interest is at stake, the court must then determine what procedural protections are appropriate, based upon a careful balancing of the interests of the prisoner and the state in light of the facts as they may be developed. *Peacock v. Board of Regents,* 510 F.2d 1324, 1327 (9th Cir. 1975).[5] It would also be advisable for the trial court to develop the facts relevant to whether the new procedural rules, if any, should be applied retroactively.[6]

For these purposes it is important to identify clearly the government action involved. Appellant does not challenge the administrative determination of the Department of Corrections announced in the Deputy Director's memorandum of November 2, 1972, that "[e]ffective this date, . . . no inmate serving life without possibility of parole is to be classified minimum custody without prior review and concurrence by the Departmental Review Board." Appellant contends only that he was entitled to due process in the decision to terminate his minimum security status pursuant to the statement in the second sentence of the Chief

5. A loss may be of such slight consequence to the inmate that it is entirely outweighed by the interest of the prison administrator in summary disposition. In such a case, few procedural formalities, or none, may be required. *See Wolff v. McDonnell,* 418 U.S. 539, 571–72 n. 19, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Clutchette v. Procunier,* 510 F.2d 613, 615 (9th Cir. 1975); *cf. Cardaropoli v. Norton,* 523 F.2d 990, 995 n. 12 (2d Cir. 1975).

6. Appellees suggest that reversal is barred by the holding in *Wolff v. McDonnell,* 418 U.S. 539, 573–74, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and *Wheeler v. Procunier,* 508 F.2d 888 (9th Cir. 1974), that the rule that due process safeguards are required in prison disciplinary proceedings is not to be applied retroactively. Appellees' suggestion necessarily assumes that this rule *does* apply to administrative classification proceedings, a position which appellees in fact vigorously reject.

The extension of the rule in *Wolff* from disciplinary to administrative classification proceedings presents substantial new issues as to whether a "liberty" interest is involved and, if so, what procedures are appropriate to protect it. The latter issue, particularly, requires the balancing of quite different considerations, and may well result in quite different procedural requirements.

The present case is no more controlled by the nonretroactivity of the *Wolff* holding regarding due process requirements in disciplinary proceedings, than *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (involving due process requirements in proceedings to revoke probation) was controlled by the nonretroactivity of the holding in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (involving due process requirements in proceedings to revoke parole). The procedural requirements announced in *Morrissey v. Brewer,* decided in 1972, were expressly applicable only "to future revocation of parole." Yet *Gagnon v. Scarpelli,* in extending the same procedural requirements to invalidate a revocation of probation that had occurred in 1965 (411 U.S. at 780, 93 S.Ct. 1756), relied primarily upon *Morrissey v. Brewer:* "Petitioner does not contend that there is any difference relevant to the guarantee of due process between the revocation of parole and the revocation of probation, nor do we perceive one." 411 U.S. at 782, 93 S.Ct. at 1759.

Of course, principles derived from cases involving nonretroactive holdings are applicable to new areas, even if the events in the later cases arose before the decision embodying the nonretroactive holding. *Wolff* itself relied upon *Morrissey v. Brewer* and *Gagnon v. Scarpelli,* both nonretroactive.

Deputy Director's memorandum that "[a]ny cases now so classified should be submitted to the Departmental Review Board for their review and action."

As Appellee Procunier pointed out in his letter of April 24, 1973, the adoption of the rule requiring prior Review Board concurrence in subsequent decisions to grant minimum security status to inmates serving a life sentence without possibility of parole was a policy decision affecting many people based upon facts that did not pertain particularly to appellant. The new rule did not provide that the existing minimum security classification of all such inmates was automatically revoked. On the contrary, it provided that such cases should be reviewed and acted upon individually. As noted, the new rule was effective November 2. The December 15 memorandum of the Chief of Classifications states that on that date the Board reviewed "all case factors" affecting appellant, and determined not to approve his assignment outside the security fence. The complaint alleges that appellant's minimum security status was terminated and he was confined within the prison on the same day. Appellant challenges only the procedures by which this determination of appellant's individual status was reached.

■ The significance of this fact is twofold. It is relevant to the procedural protections that may be appropriate; procedural devices affording an opportunity for effective participation in agency determinations are less rigorous when a rule of general application is being determined than when the issue at stake is the status under the rule of the particular individual who asserts the right to participate. K. Davis, Administrative Law Treatise §§ 7.01, 7.02, & 7.04 (1958 ed. and 1970 supp.); *see* Friendly, *"Some Kind of Hearing,"* 123 U.Pa.L.Rev. 1267, 1268 (1975). It is also relevant to the retroactivity of the procedural rules that may be adopted; the impact of retroac-

tivity of such rules upon the integrity of the fact finding involved and upon the interests both of prison administrators and inmates may be quite different in the context of adjudication than in the context of rule making.

Reversed and remanded.[7]

---

7. In view of the nature of the hearing that will be required on remand, the trial court may wish to consider the appointment of counsel to assist appellant in the presentation of his claim.