Bob LOKEY, Charlene Lokey, Jerri Lokey, and Bobbi Lokey, Plaintiffs,

v.

H. L. RICHARDSON, individually and as a California State Senator; Raymond K. Procunier, individually and as Director of California Department of Corrections; Louis S. Nelson, individually and as Warden of San Quentin Prison; Henry W. Kerr, Curtis O. Lynum, Manley J. Bowler, Walter A. Gorden, Jr., Leland M. Edman, James H. Hoover, Charles E. Brown, and Daniel R. Lopez, individually and collectively and as Members of the California Adult Authority; and the State of California, jointly and severally, Defendants.

No. C–73–0592 RFP.

United States District Court, N. D. California.

Feb. 16, 1982.

James Elmer, Oakland, Cal., for plaintiffs.

John Sugiyama and John T. Murphy, Deputy Attys. Gen., San Francisco, Cal., for defendants.

## JUDGMENT

PECKHAM, Chief Judge.

On November 23, 1962, plaintiff Bob Lokey was convicted in the Superior Court for the County of Sacramento, State of California, upon his plea of guilty, of committing first degree murder in violation of California Penal Code § 187 and kidnapping for the purpose of robbery with bodily harm in violation of California Penal Code § 209. As a result of this conviction, the superior

court sentenced Lokey to life imprisonment for the murder and life imprisonment without possibility of parole for the kidnapping. *See In re Lokey,* 64 Cal.2d 626, 414 P.2d 394, 51 Cal.Rptr. 266 (1966), *cert. denied,* 385 U.S. 888, 87 S.Ct. 188, 17 L.Ed.2d 116 (1966).

After he began serving his sentence, the California Adult Authority ("CAA" or "Authority") reviewed plaintiff's case at three year intervals. The Authority conducted the first review on November 23, 1965, the second on November 27, 1968, and the third on November 18, 1971. By the time the Authority reviewed his case for the third time, plaintiff had established himself as a model prisoner. He had achieved a minimum security status accorded few convicts at the San Quentin Prison. Plaintiff's impressive prison record is set forth in detail in *Lokey v. Richardson,* 527 F.2d 949, 950 (9th Cir. 1975). Briefly, though, while in custody he received a number of degrees in the arts and in various trades. He became an inventor and a businessman. His conduct was so outstanding that he was given a custody status which permitted him to travel outside the prison when accompanied by an unarmed security guard, to be second in command of the San Quentin firehouse located outside the security fence area, and to take part in an overnight family visitation program.

Consequently, at the conclusion of plaintiff's third hearing before the CAA, the members of the reviewing panel recommended that plaintiff's sentence on the kidnapping conviction be commuted to life imprisonment with possibility of parole and that his case be reviewed by the entire Authority.

As suggested, the CAA met *en banc* on January 17, 1972, and recommended commutation of plaintiff's sentence on the kidnapping conviction. By a memorandum dated January 28, 1972, the CAA informed the Governor of California that the plaintiff was being considered for commutation of his sentence and requested that the appropriate application forms be forwarded to him. After plaintiff completed the application, the Governor referred the matter back to the Authority for a final recommendation. Following an investigation, the Authority recommended to the Governor on December 19, 1972, that plaintiff's sentence *not* be commuted because of "insufficient evidence of rehabilitation and the gravity of the offenses involved." (Defendants' Memorandum of Points & Authorities in Support of Motion for Summary Judgment, pp. 2–3.)

On November 2, 1972, the Chief Deputy Director of the California Department of Corrections advised all penal institutions within the state that, "[e]ffective this date . . ., no inmate serving life without possibility of parole is to be classified minimum custody without prior review and concurrence by the Departmental Review Board." *See Lokey v. Richardson, supra,* 527 F.2d at 951. Defendants claim that this policy directive was prompted by two occurrences. First, following the invalidation of the death penalty as it then operated in the State of California, a number of inmates serving prison terms for the commission of serious offenses had to be reclassified. Second, during the reclassification period, an inmate serving a life sentence without possibility of parole escaped from the prison where he was confined.

At the time the directive was promulgated, plaintiff had enjoyed his minimum custody status for over two and one-half years. Nevertheless, the Board reviewed plaintiff's case on December 15, 1972, and decided to terminate his minimum security status. He received no notice of the change of status and no hearing. He was given no reason for the reclassification either orally or in writing. The revocation of his minimum security status terminated the various privileges referred to above, including his participation in the family visitation program.

On April 11, 1973, Lokey, acting on behalf of himself and three members of his family, filed a complaint under 42 U.S.C. § 1983 for injunctive relief and damages. In his complaint, plaintiff alleged that various state officials conspired to prevent commutation of his sentence. He also alleged that various state officials modified his custodial status without due process of law.

On December 4, 1973, this court granted defendants' motion for summary judgment. Plaintiff appealed to the Ninth Circuit which reversed the judgment of this court and remanded the case for further proceedings. Defendants petitioned for rehearing, suggesting that a rehearing *en banc* be granted. On December 9, 1975, the Ninth Circuit ordered its earlier opinion withdrawn. Then, in a new opinion, the court of appeals again reversed the judgment of this court and remanded the case for further proceedings. *Lokey v. Richardson, supra*, 527 F.2d 949. That judgment was vacated by the Supreme Court, 427 U.S. 902, 96 S.Ct. 3186, 49 L.Ed.2d 1196, for reconsideration in light of its holdings in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).[1] The Ninth Circuit, in turn, remanded the case to this court in *Lokey v. Richardson*, 540 F.2d 1022 (9th Cir. 1976). After we dismissed the case, in part in reliance on *Meachum v. Fano, supra*, and *Montanye v. Haymes, supra*, the action came before the Ninth Circuit for the third time, *Lokey v. Richardson*, 600 F.2d 1265 (9th Cir. 1979), *cert. denied*, 449 U.S. 884, 101 S.Ct. 238, 66 L.Ed.2d 110 (1980).

The Ninth Circuit disagreed with this court's interpretation of the *Fano* and *Haymes* cases. The appellate court conceded that these two Supreme Court decisions denied that prisoners are deprived of due process rights whenever they are transferred within a prison system, even if the transfer results in less pleasant facilities or is executed for disciplinary reasons. The appellate court noted, however, that the Supreme Court left the door open to the imposition of due process requirements if there is a state law or practice which would give rise to a right or justifiable expectation that the prisoner's degree of confinement would change only for certain reasons

or after certain procedures. The appellate court concluded that it could not agree that Lokey's complaint failed to state a proper claim until Lokey was given "an opportunity to explore and present his case with respect to state-created expectations." *Lokey v. Richardson, supra*, 600 F.2d at 1267. Finally, the court suggested that new counsel be appointed to assist plaintiff in the presentation of his claim on remand.

In accordance with the Ninth Circuit's most recent opinion in this case, this court appointed new counsel to represent plaintiff on March 18, 1981. We also endeavored to provide plaintiff with "an opportunity to explore and present his case with respect to state-created expectations" by ordering that the period for requesting discovery be continued to, and including, September 24, 1981. Subsequent to the closing of the discovery period, defendants filed a motion for dismissal and a motion for summary judgment. Both motions raise for the first time the issue of defendants' respective immunities from liability in this section 1983 action.

Defendants' motion for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is incorporated into the motion for summary judgment, which is accompanied by the required supporting affidavits. For this reason, and because both parties have focused their subsequent supporting papers on the summary judgment motion, we shall consider these two motions together as a motion for summary judgment by defendants.

## I. IMMUNITY DEFENSES

### A. *The State of California*

Defendants rely on *Williford v. California*, 352 F.2d 474 (9th Cir. 1965), in support of their claim that a state is not a person within the meaning of section 1983. We agree with defendants' conclusion that the State of California is immune from liability

---

1. *Meachum v. Fano, supra*, and *Montanye v. Haymes, supra*, rejected the theory that the due process clause alone entitled a prisoner to a hearing in connection with a transfer within the prison system, absent a state law or practice which gives rise to a right or a justifiable

expectation that a prisoner will not be transferred unless found guilty of misconduct. *See* *Montanye v. Haymes, supra*, 427 U.S. at 242, 96 S.Ct. at 2547; *Meachum v. Fano, supra*, 427 U.S. at 226–28, 96 S.Ct. at 2539–40.

in this case despite our rejection of their underlying reasoning. *Williford* relies on the holding in *Monroe v. Pape*, 365 U.S. 167, 187–91, 81 S.Ct. 473, 484–86, 5 L.Ed.2d 492 (1961), that a municipality is not a "person" within the meaning of section 1983. That part of *Monroe* has been expressly overruled in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978).

■ To the benefit of California, however, the Supreme Court has subsequently made it clear that *Monell* does not alter the rule that section 1983 does not constitute an abrogation of the eleventh amendment immunity of the states. In *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), the Court concluded that Congress did not intend by the general language of section 1983 "to override the traditional sovereign immunity of the States." *Id.* at 341, 99 S.Ct. at 1145 (relying on *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam) and *Edelman v. Jordan*, 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974). The Ninth Circuit had occasion to address directly this question in *Ginter v. State Bar of Nevada*, 625 F.2d 829 (9th Cir. 1980). There the appellate court agreed that the states' eleventh amendment immunity was not abrogated by section 1983. Accordingly, the State of California is immune from the instant case pursuant to *Quern v. Jordan, supra,* and *Ginter v. State Bar of Nevada, supra.*

B. *The California Adult Authority and its Members, and State Senator H. L. Richardson*

Despite the numerous circuit and district court opinions in this case (or, perhaps, because of them), there remains some confusion over which defendants are still proper party defendants to this action. Although he did not identify them as such, plaintiff stated two theories of recovery in his complaint. *See* discussion, *supra.* Under his first theory, plaintiff alleged that various state officials conspired to prevent commutation of his sentence from life imprison-

ment without possibility of parole to life imprisonment with possibility of parole. (Plaintiff's Complaint at ¶ 33.) Under his second theory, plaintiff alleged that various state officials modified his custodial status without due process of law. (Plaintiff's Complaint at ¶ 34.)

In response to plaintiff's initial action, we granted summary judgment to defendants. Plaintiff restricted his appeal to the issue presented under his second theory, *i.e.*, the claim that the California Department of Corrections rescinded his minimum custody classification without due process of law. Logically, therefore, summary judgment should be granted in favor of those defendants who are implicated only under plaintiff's first theory regarding the denial of commutation of his sentence.

Plaintiff, though, implicates all defendants under both theories alleged in his complaint. (Plaintiff's Complaint at ¶¶ 33, 34 and 41.) We have serious doubts whether State Senator Richardson and the members of the CAA are properly joined as party defendants in this case. They appear to have had nothing to do with the modification of plaintiff's custody reclassification, which is the only surviving theory in this case. We need not decide that question, however, as it is clear that the Senator and the members of the CAA are immune from this section 1983 action under any theory alleged by the plaintiff.

■ 1. *California Adult Authority and its members.* The analysis in part I(A), *supra*, which concludes that the State of California is not subject to this section 1983 suit under the eleventh amendment, applies with equal force to "arms" of the state such as state agencies. *See Ginter v. State Bar of Nevada, supra,* 625 F.2d at 830; *Allison v. California Adult Authority*, 419 F.2d 822, 822–23 (9th Cir. 1969); *NAACP v. State of California*, 511 F.Supp. 1244, 1257 (E.D.Cal. 1981). The California Adult Authority is, therefore, absolutely immune from liability in this case.

These cases do not, however, resolve the separate question of the scope of immunity,

**1020**

if any, possessed by individual CAA officials. Rather, that question is controlled by the recent Ninth Circuit decision in *Sellars v. Procunier*, 641 F.2d 1295 (9th Cir. 1981). The *Sellars* case involved a section 1983 action filed by an inmate of the California Men's Colony at San Luis Obispo alleging that the chairman and other officials of the CAA conspired to deprive him of his civil rights by giving him a parole release date that required him to serve an excessively long prison sentence. The district court granted summary judgment for the defendants on the ground that parole board members are absolutely immune to suit under section 1983 for actions taken when processing parole applications. The appellate court, after a detailed review of the relevant Supreme Court and Ninth Circuit caselaw, affirmed.

We believe that parole board officials perform functionally comparable tasks to judges when they decide to grant, deny, or revoke parole. The daily task of both judges and parole board officials is the adjudication of specific cases or controversies. Their duty is often the same: to render impartial decisions in cases and controversies that excite strong feelings because the litigant's liberty is at stake. They face the same risk of constant unfounded suits by those disappointed by the parole board's decisions.

Judges enjoy absolute immunity from civil rights suits in order to keep the judicial decision-making process pristine.

    .    .    .    .    .

We believe that the same degree of protection must be accorded to the decision-making process of parole board officials. Just as the decision-making process of judges must be kept free from fear, so must that of parole board officials.

*Id.* at 1303.

■ The CAA is being sued in this case for actions it took in processing plaintiff's application for commutation of his sentence. In denying the application, the Authority was acting in its advisory capacity as specifically addressed by the *Sellars* court. In carrying out this responsibility,

the Authority officials should "be kept free from fear." *Id.* The court of appeals has explained

Without this protection, there is the same danger [as with judges] that the decision-maker might not impartially adjudicate the often difficult cases that come before them. If parole board officials had to anticipate that each time they rejected a prisoner's application for parole, they would have to defend that decision in federal court, their already difficult task of balancing the risk involved in releasing a prisoner whose rehabilitation is uncertain against the public's right to safety would become almost impossible. Furthermore, time spent in depositions and on the witness stand defending their actions would leave these overburdened public servants with even less time to perform their crucial tasks.

*Id.*

This grant of absolute immunity should be applied cautiously. For example, the Ninth Circuit did not address the question of the immunity of an Authority member with regard to his or her performance of any tasks that may *not* be functionally comparable to that of a judge. Nevertheless, the possibility does exist that this absolute immunity for parole board officials could leave a prisoner without civil redress against an Authority official who has deprived the prisoner of liberty through malicious or dishonest actions. The *Sellars* court noted this problem and, relying on *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), held that qualifying the absolute immunity provided CAA officials in their judge-like capacity would disserve the broader public interest.

As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought ... better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

641 F.2d at 1303.

Finally, the *Sellars* court explained that, although a prisoner may be prevented from

bringing a section 1983 suit against CAA officials, he is not necessarily totally unprotected from capricious or arbitrary decisions by the Authority. Not only does California law provide safeguards in the form of various in-custody hearings on such matters as parole and commutations of sentences, but the prisoner always has the right to file for habeas corpus relief. The appellate court concluded that such safeguards are sufficient to protect a prisoner's constitutional rights. That holding is the law of the Ninth Circuit and therefore controlling in this case. Accordingly, the CAA officials are immune from plaintiff's suit.

### C. *State Senator H. L. Richardson*

It is clear from plaintiff's pleadings that he considers State Senator H. L. Richardson to be the primary miscreant in this action. Accepting plaintiff's allegations as true, as we must for purposes of defendants' rule 56(b) motion, Senator Richardson, upon learning that the CAA had recommended that plaintiff's sentence be commuted from life without possibility of parole to life with possibility of parole, took actions to prevent the commutation. First, he used the power and influence of his position as a member of the Select Committee on Penal Institutions of the California Legislature to cause the CAA to recall plaintiff's case from the California Clemency Secretary's Office, reevaluate the case, and arrive at the new conclusion that plaintiff's sentence should not be commuted. (Plaintiff's Complaint at ¶ 33.) In addition, Senator Richardson made allegedly libelous statements to the press about plaintiff's case as an example to support the Senator's "campaign" to restrict the commutation powers of the Governor. (Plaintiff's Complaint at ¶¶ 34–38.)

■ This court does not take such charges of questionable conduct by a state senator lightly. Nevertheless, it is clear that the alleged activity of Senator Richardson, even if proved at trial, would not present a claim upon which relief could be granted. The Supreme Court stated the law in this area in *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019

(1951), when it held that legislators acting in the sphere of legitimate legislative activity are immune from suits brought under section 1983. The Court in *Tenney* carefully weighed the competing considerations of public redress and legislative immunity and came out in favor of the latter.

The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. The holding of this Court in *Fletcher v. Peck* (U.S.) 6 Cranch. 87, 130, 3 L.Ed. 162, 176, that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned.

*Id.* at 377, 71 S.Ct. at 788.

The *Tenney* opinion is especially helpful in the analysis of the instant case as both involve the activities of members of duly-formed legislative committees. The Supreme Court explained that the judicial branch should seek to avoid the inevitable controversies that arise from the workings of such committees.

Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses.

*Id.* at 378–79, 71 S.Ct. at 789.

The *Tenney* holding, of course, does not purport to protect legislators from activity outside the sphere of legitimate legislative activity. The Supreme Court, however, has defined such activity in broad terms. For

example, in *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), the Chairman of the Internal Security Subcommittee of the Judiciary Committee of the United States Senate was charged in a section 1983 action with participating in a conspiracy with Louisiana officials to seize the property and records of Blacks by unlawful means in violation of their constitutional rights. The searches, arrests, and threats of prosecution of the Black plaintiffs were allegedly made as part of a plan to harass and discourage them from asserting and attempting to vindicate their civil rights. *See Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Even so, the Supreme Court upheld the lower court's order granting summary judgment to Senator Eastland.

> The record does not contain evidence of his involvement in any activity that could result in liability. It is the purpose and office of the doctrine of legislative immunity, having its roots as it does in the Speech or Debate Clause of the Constitution, that legislators engaged "in the sphere of legitimate legislative activity," [citing *Tenney*] should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.

387 U.S. at 83–84, 87 S.Ct. at 1426–27 (citations omitted).

Following the guidance offered by these Supreme Court decisions, we find that plaintiff's allegations regarding State Senator Richardson, even if found to be true, reflect that the Senator was acting within the lawful scope of his duties as a member of the California Senate Select Committee on Penal Institutions and as a representative of his constituency. Accordingly, Senator Richardson has absolute immunity from plaintiff's suit.

### D.  *Raymond Procunier and L. S. Nelson*

[5]  The two remaining defendants in this action are the prison officials. Raymond Procunier was the Director of the California Department of Corrections when plaintiff's suit was filed and Louis S. Nelson was the Warden at the prison at San Quentin where plaintiff was incarcerated. The Supreme Court has ruled that prison officials subject to section 1983 civil rights suit do not possess absolute immunity. *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). The *Navarette* opinion did hold, however, that prison officials are entitled to the qualified immunity described in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90, 71 Ohio Ops.2d 474 (1974) and *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). That immunity was first articulated in *Scheuer*:

> [I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

416 U.S. at 247–48, 94 S.Ct. at 1691–92.

This standard does not lend itself to easy application in every situation. It is comprised of both objective and subjective components. On the objective level, the trial court must be convinced that there existed "reasonable grounds for the belief formed at the time and in light of all the circumstances." But, additionally, a subjective "good-faith belief" must have existed at the time the action was taken.

This two-part standard was further developed in *Wood v. Strickland*:

> [I]f the work of the schools is to go forward [there must be a degree of immunity so that] public school officials understand that action taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity.

420 U.S. at 321, 95 S.Ct. at 1000. This degree of immunity would be unavailable, however, if the official

> knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student.

*Id.* at 322, 95 S.Ct. at 1000.

■ Under the first part of the *Wood v. Strickland* rule (as applied in *Navarette* ), the immunity defense would be unavailing to these defendants if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm. In the instant case, it could hardly be argued that there existed a "clearly established" constitutional right protecting Lokey's minimum custody status in late 1972 when the events allegedly took place. This very court has rejected plaintiff's argument twice before and even now, plaintiff's strongest argument in support of his procedural due process deprivation claim relies on a Supreme Court case which dealt with property interests rather than liberty interests. *See* discussion in part II, *infra*, re *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). We cannot find, therefore, any basis for rejecting the immunity defense on the ground that these two defendants knew or should have known that their alleged conduct violated a constitutional right. Because they could not reasonably have been expected to be aware of a constitutional right that had not yet been declared, and has not to this day, defendants did not act with such disregard for the established law that their conduct "cannot reasonably be characterized as being in good faith." *Wood v. Strickland, supra,* 420 U.S. at 322, 95 S.Ct. at 1000; *Procunier v. Navarette, supra,* 434 U.S. at 565, 98 S.Ct. at 861.

The second branch of the *Wood v. Strickland* standard, however, is more problematic. The subjective aspect of this standard would authorize liability in those cases where the prison official has acted with "malicious intention" to deprive the plaintiff of a constitutional right or to cause him "other injury." This part of the rule, therefore, deals with "intentional injury," contemplating that the actor intends the consequences of his conduct. *Procunier v. Navarette, supra,* 434 U.S. at 566, 98 S.Ct. at 862; Restatement (2nd) of Torts, § 8A (1965). Plaintiff's complaint, however, does not specifically allege *any* bad-faith on the part of Procunier or Nelson. Every allegation of malice and libel singles out State Senator Richardson or the California Adult Authority, both of whom are absolutely immune. *See* discussion in part I(B), *supra.* The only reference in plaintiff's complaint to these officers, apart from background, is found at paragraph 41, which states in part:

> The false, defamatory and injurious statements the defendants ADULT AUTHORITY and H. L. RICHARDSON issued to the press for publication and the conspiracy they have entered into there for the purpose of depriving plaintiffs of due process of law, all constitute a breach of duty which caused L. S. NELSON, under the direct orders of defendant RAYMOND PROCUNIER, to physically remove all plaintiffs from the rehabilitative program (Family Visiting Program), and removed BOB LOKEY from: . . . [various freedoms and benefits accruing to prisoners with minimum custody status].

■ To the extent that a malicious intent to harm is a ground for denying immunity, that consideration is not clearly implicated by the section 1983 claim against these two prison officials. It should be borne in mind, however, that this complaint was filed by an incarcerated prisoner proceeding *pro se.* The court should construe such pleadings as liberally as possible without becoming a surrogate attorney for the party or violating the letter or spirit of the Federal Rules of Civil Procedure. When a person either

cannot afford the services of an attorney or chooses to prosecute his claim himself, the court should proceed painstakingly in an effort to discern the nature of the plaintiff's claim and to insure that his or her lack of familiarity with legal proceedings does not result in forfeiture of a potentially valid claim. *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972); *Harris v. Jacobs*, 621 F.2d 341 (9th Cir. 1980).

■ We therefore conclude that plaintiff Lokey did intend to allege bad-faith on the part of Procunier and/or Nelson and that, as a consequence, these defendants fail to meet the subjective branch of the *Wood v. Strickland* standard for the granting of qualified immunity.[2]

In accordance with the above findings we hold that the State of California, the California Adult Authority and its members, and State Senator H. L. Richardson have absolute immunity from this action, and defendants' motion for summary judgment is granted as it pertains to these defendants. We find that Procunier and Nelson do not have immunity from this action, based on the allegations of bad-faith proffered by the plaintiff and his counsel. Therefore, we must now proceed to a discussion of the substantive law presented by plaintiff's claim.

## II. DUE PROCESS VIOLATION CLAIM

The only substantive issue before this court is whether summary judgment is proper on plaintiff's claim that the decision of the California Department of Corrections to rescind his minimum custody classification was made without procedural due process. In light of the Ninth Circuit's most recent remand, we have allowed plaintiff's newly-appointed counsel to conduct extended discovery. On the basis of the documents and papers filed by attorneys for both plaintiff and defendants, and especially in light of the Supreme Court's recent decision in *Jago v. Van Curen*, —— U.S.

——, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981), we are again compelled to grant defendants' motion for summary judgment.

■ We agree that plaintiff suffered a "grievous loss" in 1972 when his minimum custody status was rescinded. Plaintiff had been so classified for a period of two and one-half years. As previously explained, the minimum custody classification permitted plaintiff to travel outside the prison when accompanied by an unarmed security guard, to act as second in command of the prison firehouse located outside the security fence area, and to participate in an overnight family visitation program. These privileges were lost upon reclassification. The Supreme Court, though, has rejected the notion that *any* grievous loss visited upon a person by the state is sufficient to invoke the procedural protections of the Due Process Clause. *Meachum v. Fano, supra*, 427 U.S. at 224, 96 S.Ct. at 2538. As we review the plaintiff's claim in the instant case, we must be mindful that "the question is not merely the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property language' of the Fourteenth Amendment.'" *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

In *Meachum v. Fano, supra*, the six respondent inmates had been transferred from a medium-security institution to a maximum-security institution at which the living conditions were substantially less favorable. The transfers were based on information that each of the six prisoners had engaged in criminal conduct at the medium-security prison. The prisoners brought a section 1983 action alleging they had been deprived of liberty without due process of law in that the transfers occurred without an adequate fact-finding hearing. The Supreme Court declined to second-guess the "informed predictions [of prison officials] as to what would best serve institutional se-

---

**2.** In further support of this conclusion, plaintiff's current attorney stated in oral argument on this summary judgment motion that plaintiff

did in fact intend to allege such bad-faith on the part of the prison officials.

curity or the safety and welfare of the inmate." *Id.* at 225, 96 S.Ct. at 2538. The Supreme Court concluded that to hold that such prison transfers "are within the reach of the procedural protections of the Due Process Clause would place the Clause astride the day-to-day functioning of state prisons and involve the judiciary in issues and discretionary decisions that are not the business of federal judges." *Id.* at 229, 96 S.Ct. at 2540.

Both *Fano* and the companion case of *Montanye v. Haymes, supra,* however, acknowledge that a Due Process Clause liberty interest of a prisoner may be infringed if some state law or practices exists which gives rise to a right or justifiable expectation that the prisoner's degree of confinement will change only for certain reasons or after certain procedures. 427 U.S. at 223–27, 96 S.Ct. at 2537–39; 427 U.S. at 242, 96 S.Ct. at 2547. Therefore, we must examine whether any state law existed in 1972 (when plaintiff's cause of action arose) which supports the possibility that such state-based expectations or rights with respect to plaintiff's confinement existed.

In California, once a defendant has been convicted of a felony offense and has been committed to state prison, the decision of the type of institution he should be placed in, or transferred to, has historically been a matter falling within the authority of the Director of the Department of Corrections. This authority has been specified in statutory provisions and implemented through regulatory enactments. *See, e.g.,* California Penal Code §§ 5054, 5068 and 5080. In the exercise of this authority, the Director of Corrections has issued an Inmate Classification Manual to guide classification and placement decisions. The manual directs, *inter alia,* the establishment of Institutional Classification Committees. In 1972, these committees, operating under very general procedures, assigned a custodial classification to each inmate.

Despite creating these committees, as well as a Departmental Review Board which has to act in unusual and complex situations, the manual in 1972 did not define the different levels of custody for inmates. Neither did the manual identify the types of inmates authorized to be in each custodial status, nor did it delimit the procedures to be followed for transferring inmates from one custodial level to another.

█ It seems clear, therefore, that in 1972 the plaintiff had no expectations rooted in state law or practice regarding his custodial classification. Plaintiff's former appellate counsel acknowledged this in his supplemental brief and supplemental reply brief to the court of appeals. Accordingly, we find that plaintiff had no legitimate claim of entitlement to his custodial status based on state statutes or regulations.

We must now consider whether, notwithstanding the absence of any state law or regulations, a liberty interest such as that asserted by plaintiff can arise from "mutually explicit understandings" between himself and prison officials. *See Perry v. Sindermann, supra,* 408 U.S. at 601, 92 S.Ct. at 2699. The Supreme Court recently ruled in this uncertain area of law in *Jago v. Van Curen, supra.* There, a prisoner was notified of a parole agreement whereby the Parole Board of the State of Ohio was ordering his release on parole. He was thereafter notified that, because of information received to the effect that he had not been entirely truthful in his interview or in the parole plan that he had submitted, the earlier decision to grant parole was being withdrawn and parole denied. The Supreme Court explored the possibility that the earlier notification of parole had created a "mutually explicit understanding." It determined that such understandings as were the subject-matter of *Sindermann* have "a far more useful place in determining protected property interests than in determining liberty interests protected by the Due Process Clause of the Fourteenth Amendment." —— U.S. at ——, 102 S.Ct. at 35. *Sindermann* relied on two analogous doctrines: the principle of implied contract and the labor-law principle that an industrial tradition and history can supplement collective bargaining agreements. The *Van Curen* decision held that neither of these

doctrines has relevance in the parole setting. More to the point, according to the per curiam decision, is the Supreme Court's previous recognition that prison administrators' need for flexibility demands restraint in judicial recognition of protected liberty interests for prisoners. The Supreme Court held that, because the Ohio statutes created no protected liberty interest in parole and because parole is entirely discretionary, the prisoner could not prevail in his habeas corpus proceeding. The Court concluded that the case was more like *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (no liberty interests in inmate seeking parole) than *Morrissey v. Brewer, supra* (liberty interest in parolee seeking to stay on parole).

It is clear that *Van Curen*, in conjunction with *Fano* and *Haymes*, effectively precludes plaintiff in the instant case from arguing that "mutually explicit understandings" existed which gave rise to a protected liberty interest. The unmistakable direction of the Supreme Court to the federal trial courts is not to restrict the actions of prison administrators and parole authorities unless their actions infringe clearly established constitutional or statutory rights of prisoners. We have already shown that no state statutes existed in 1972 which could have given rise to a protected liberty interest with respect to the plaintiff's custody status. *Van Curen* further instructs us that plaintiff may not prevail based on "mutually explicit understandings" alone. We must therefore grant defendants' motion for summary judgment.

In so doing, we are cognizant of the weakness in the reasoning underlying the *Van Curen* decision. As long as state prison and parole officials manage to keep their guidelines informal, unofficial, and (especially) unpublished, they do not create additional liberty interests which may be protected by the fourteenth amendment. We do not, of course, imply that the Supreme Court's intent is to create a disincentive to the formation of clearly established guidelines in the administration of prisons. Nevertheless, this may be a lamentable side-effect of the Supreme Court's continuing efforts to provide prison administrators with the necessary flexibility to operate efficiently in a day-to-day context.

IT IS SO ORDERED.